FILED
COURT OF APPEALS
DIVISION II

2013 APR -2 AM 8: 45

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 41990-4-II |
| Respondent, | |
| v. | |
| JOEL ALEXANDER WILSON, | PART PUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Joel Alexander Wilson appeals his jury trial convictions and sentences for 13 counts of first degree child rape of his ex-girlfriend's daughter, AH.[1] He argues that the trial court violated his right to a public trial and his right to be present at all critical stages of his proceeding when the bailiff excused two jurors for illness-related reasons before voir dire began in the courtroom.[2] We hold that these two administrative juror excusals occurred before Wilson's right to a public trial and right to be present were triggered; accordingly, we affirm.

## FACTS

There is scant evidence in the record about the pre voir dire jury selection process in Wilson's case. From the evidence we do have, it appears that prospective jurors were given a questionnaire on the first day of jury service. The questionnaire (1) informed the jurors that

---

[1] To provide confidentiality, we use the juvenile victim's initials.

[2] We address Wilson's additional arguments later in the unpublished portion of this opinion.

Wilson was charged with first degree child rape; (2) solicited information about the jurors' personal experiences with sexual assault; and (3) required the jurors to sign the questionnaire after completing it, certifying that their answers were true to the best of their knowledge and belief. The prospective jurors completed this questionnaire at some point, although it is not clear when it was administered.

Before the jury venire was called into the courtroom for voir dire, the trial court's bailiff excused from the jury pool two ill persons who had reported for jury service: One juror had "back problems," was on "narcotic pain killers," and was having "problems standing and sitting"; he was apparently sick enough that the bailiff excused him "before [the juror] even said anything" or had a chance to complete the juror questionnaire. Verbatim Report of Proceedings (VRP) (Feb. 14, 2011) at 25, 26. The second excused juror apparently completed the juror questionnaire, but he was eventually excused as being "ill." VRP (Feb. 14, 2011) at 24. In excusing both jurors, the bailiff followed the trial court's written policy, which allows administrative staff to excuse jurors pretrial for illness-related reasons, and rescheduled them for jury service at a later date. Both administrative excusals occurred before 9:00 AM.

The trial court subsequently informed both counsel and Wilson that the bailiff had excused two potential jurors for being ill; but it offered to bring the excused jurors into the public courtroom for voir dire in Wilson's presence, if he wished. Wilson, however, did not pursue this offer. Later, the trial court conducted voir dire of the jury venire in open court and in Wilson's

presence. With the parties' assent, the parties empanelled 14 jurors, including 2 alternates, for Wilson's trial. The jury convicted Wilson as charged.[3] He appeals.

## ANALYSIS

Wilson argues that the trial court violated his state and federal constitutional rights to a public trial because the bailiff excused two jurors for illness-related reasons before voir dire began in the courtroom without the trial court's first conducting a *Bone-Club* analysis.[4] He also argues that the trial court violated his right to be present at all critical stages of his proceeding because the two ill jurors were excused outside his presence. Disagreeing, we hold that the bailiff's pre voir dire, administrative excusal of two ill jurors did not implicate Wilson's public trial right or his right to be present.

## I. DEFENDANT'S RIGHT TO A PUBLIC TRIAL

We first address Wilson's argument that the trial court violated his right to a public trial. Wilson contends that we must reverse his convictions because (1) the bailiff "closed" a portion of "jury selection" when she excused the two ill jurors outside the courtroom before voir dire began; (2) both the United States and the Washington Supreme Courts have held that the public trial right applies to "jury selection" and that a trial court must conduct a *Bone-Club* analysis before closing any portion of "jury selection" proceedings; and (3) "jury selection" had already

---

[3] After we heard oral argument in this case, the Washington Supreme Court issued its decision in *State v. Sublett*, 176 Wn.2d 58, 72-73, 292 P.3d 715 (2012), announcing a new "experience and logic" test. In our view, this new test applies to hardship excusals and other pre voir dire portions of the jury selection process. Therefore, we asked the parties to file supplemental briefs addressing the impact, if any, of this new decision on Wilson's pending appeal. We received these supplemental briefs in January 2013.

[4] *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).

commenced in his case when the bailiff excused the two ill jurors because the prospective jurors were under "oath" and they had received a juror questionnaire specifically "tailored to the facts of [his] case." Supp. Br. of Appellant at 5-9. This argument fails.

## A. Standard of Review

Whether a defendant's constitutional right to a public trial has been violated is a question of law, which we review de novo on direct appeal. *State v. Paumier*, 176 Wn.2d 29, 34, 288 P.3d 1126 (2012); *State v. Lormor*, 172 Wn.2d 85, 90, 257 P.3d 624 (2011). A criminal defendant has a right to a public trial under the state and federal constitutions. *Lormor*, 172 Wn.2d at 90-91; U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22. Likewise, the public has a complementary right to open proceedings under the state and federal constitutions. *Lormor*, 172 Wn.2d at 91; U.S. CONST. amend. I; WASH. CONST. art. I, § 10.

The right to a public trial, however, is not absolute, and a trial court may close the courtroom under certain circumstances. *State v. Momah*, 167 Wn.2d 140, 148, 217 P.3d 321 (2009), *cert. denied*, 131 S. Ct. 160 (2010); *State v. Easterling*, 157 Wn.2d 167, 174-75, 137 P.3d 825 (2006). To protect the public trial right and to determine whether a closure is appropriate, Washington courts must apply the *Bone-Club* factors[5] and make specific findings on

---

[5] The *Bone-Club* factors are as follows:
> "1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
> 2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure and the public.

the record to justify a closure. *Momah*, 167 Wn.2d at 148–49. This requires that the trial court consider "alternatives to closure" to ensure the least restrictive means of closure is adopted. *Paumier*, 176 Wn.2d at 35; *State v. Wise*, 176 Wn.2d 1, 10, 288 P.3d 1113 (2012). Failure to conduct a *Bone-Club* analysis before closing a proceeding required to be open to the public is a structural error warranting a new trial. *Paumier*, 176 Wn.2d at 35.

But, as our Supreme Court has also recognized and we discuss more fully below, "not every interaction between the court, counsel, and defendants will implicate the right to a public trial, or constitute a closure if closed to the public." *State v. Sublett*, 176 Wn.2d 58, 71, 292 P.3d 715 (2012) (lead opinion). Therefore, before determining whether there was a violation of Wilson's right to a public trial, we must first consider "whether the proceeding at issue implicates the public trial right, thereby constituting a closure at all." *Sublett*, 176 Wn.2d at 71.

### B. Threshold Public Trial Issue

Our Supreme Court recently issued several public trial cases on the same day, including *Paumier*, *Wise*, and *Sublett*. Collectively, these opinions appear to articulate two steps for determining the threshold issue of whether a particular proceeding implicates a defendant's public trial right, thereby requiring a *Bone-Club* analysis before the trial court may "close" the courtroom: First, does the proceeding fall within a specific category of trial proceedings that our Supreme Court has already established implicates the public trial right? Second, if the

---

5. The order must be no broader in its application or duration than necessary to serve its purpose."
*Bone-Club*, 128 Wn.2d at 258–59 (alteration in original) (quoting *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 210–11, 848 P.2d 1258 (1993)).

proceeding does not fall within such a specific category, does the proceeding satisfy *Sublett*'s "experience and logic" test?[6]

### 1. Specific proceeding implicating public trial right

In *Paumier* and *Wise*, our Supreme Court confronted the now familiar question of whether the trial court violated a defendant's right to a public trial by privately questioning individual jurors in chambers during voir dire without first conducting a *Bone-Club* analysis. *See Paumier*, 176 Wn.2d at 34-37; *Wise*, 176 Wn.2d at 11-15. To resolve the threshold issue of whether this type of proceeding implicated the defendants' public trial right, the Supreme Court relied on earlier cases in which it had already established that the public trial right applied to jury voir dire proceedings. *Wise*, 176 Wn.2d at 11 (citing *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 100 P.3d 291 (2004), *Momah*, and *State v. Strode*, 167 Wn.2d 222, 227, 232, 217 P.3d 310 (2009)); *Paumier*, 176 Wn.2d at 34-35 (citing *Momah* and *Wise*). Accepting jury voir dire as an established proceeding to which the public trial right applies, the Supreme Court held that (1) the *Paumier* and *Wise* trial courts had closed their courtrooms by questioning prospective jurors in chambers without first conducting a *Bone-Club* analysis; and (2) such courtroom closures are structural error, requiring reversal of these defendants' convictions. *See Paumier*, 176 Wn.2d at 35-37; *Wise*, 176 Wn.2d at 11-13, 15.

### 2. "Experience and Logic" test

In contrast, in *Sublett*, our Supreme Court faced the novel question of whether the trial court violated a defendant's public trial right by discussing with counsel in chambers a question that the jury had posed during jury deliberations. The Court had not previously addressed or

---

[6] We discuss the *Sublett* experience and logic test later in this opinion.

established whether a deliberating jury's question implicated a defendant's public trial right; therefore, the Court could not rely merely on its case law, or the "first step" that it had used in *Paumier* and *Wise*, to resolve whether such a proceeding implicates the public trial right. Thus, our Supreme Court created a "second step" by adopting the United States Supreme Court's "experience and logic" test.[7] *Sublett*, 176 Wn.2d at 72-73 (citing *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-10, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986) (*Press* II)). Applying this experience and logic test, our Supreme Court held that (1) the public trial right does not "attach" to proceedings involving jury questions during deliberations; and (2) therefore, Sublett's trial court did not close the courtroom or violate his public trial right by discussing the juror's question in chambers without first conducting a *Bone-Club* analysis.[8] *Sublett*, 176 Wn.2d at 75-78.

### C. Pretrial Administrative Juror Excusals

We now apply this two-step process to determine whether Wilson's public trial right was implicated here. We first ask whether the bailiff's excusing two ill jurors pretrial, before voir dire began, falls within a category of proceedings that our Supreme Court has already acknowledged implicates a defendant's public trial right, as did the voir dire proceedings in *Paumier* and *Wise*. If the bailiff's pre voir dire juror excusals do not fall within such a category,

---

[7] Only four justices signed the lead opinion in *Sublett*; but with Justice Stephens' concurrence, a majority adopted the federal "experience and logic" test as the appropriate guide for determining "when the public trial right attaches." *Sublett*, 176 Wn.2d at 136 (Stephens, J. concurring in the result). More recently our Supreme Court cited *Sublett* in unanimously applying this "experience and logic" test in *In Re Pers. Restraint of Yates*, No. 82101-1, 2013 WL 991900, at *9 (Wash. Mar. 14, 2013).

we next ask whether this proceeding meets the *Sublett* experience and logic test, thus implicating Wilson's public trial right. Answering "no" to both inquiries, we hold that the bailiff's pre voir dire, administrative excusals of these two ill jurors did not implicate Wilson's public trial right.

1. No case law addressing whether such excusals implicate defendant's public trial right

Wilson argues that the bailiff's pre voir dire excusal of two jurors for illness-related reasons falls within *Paumier*'s and *Wise*'s category of proceedings that the Supreme Court has already established implicates the public trial right because these juror excusals were part of the "jury selection." Supp. Br. of Appellant at 5-6. Although we agree that these juror excusals were part of the general "jury selection" process in Wilson's case, we do not agree that Supreme Court precedent holds that the public trial right applies to the entire jury selection process; rather, the juror excusals addressed in *Paumier* and *Wise* both involved the narrower, voir dire component of jury selection.

More specifically, as we explain in more detail below, existing case law does not hold that a defendant's public trial right applies to every component of the broad "jury selection" process (which process includes the initial summons and administrative culling of prospective jurors from the general adult public and other preliminary administrative processes). Rather, existing case law addresses application of the public trial right related *only* to a specific component of jury selection—i.e., the "voir dire" of prospective jurors who form the venire (comprising those who respond to the court's initial jury summons and who are *not* subsequently

---

[8] In applying this experience and logic test to juror questions during deliberations, our Supreme Court in *Sublett* seems to have established a specific category of trial proceedings that does not implicate the public trial right.

excused administratively). Thus, whether pretrial administrative juror excusals implicate a defendant's public trial right is one of first impression.

In *Paumier* and *Wise*, our Supreme Court appears to have used the terms "jury selection" and "voir dire" interchangeably in the *Bone-Club* context.[9] But we view this interchangeable usage as inadvertent and *not* as evincing the Court's intent to treat these two terms as synonymous for precedential purposes.[10] On the contrary, *Paumier, Wise*, and the cases these opinions cite for support all involved courtroom closures during only the *voir dire component* of jury selection.[11] *Paumier*, 176 Wn.2d at 34-35; *Wise*, 176 Wn.2d at 11-12. These cases did not,

_____

[9] *See e.g., Paumier*, 176 Wn.2d at 34-35 (stating "'[t]his presumption of openness extends to *voir dire*'" and that "individually questioning potential jurors is a courtroom closure requiring a *Bone-Club* analysis" (emphasis added) (quoting *Momah*, 167 Wn.2d at 148)); *Wise*, 176 Wn.2d at 12 n.4 (stating "[i]t is not necessary to engage in a complete 'experience and logic test,' because 'it is well settled that the right to a public trial also extends to *jury selection*'" (emphasis added) (citing *Sublett*, 176 Wn.2d at 73-75 and quoting *State v. Brightman*, 155 Wn.2d 506, 515, 122 P.3d 150 (2005))).

[10] We further note that in *Sublett*, issued on the same day as *Paumier* and *Wise*, our Supreme Court also cited the United States Supreme Court and noted, "[R]esolution of whether the public trial right attaches to a particular proceeding cannot be resolved based on the label given to the proceeding." *Sublett*, 176 Wn.2d at 72-73 (citing in *Press II*, 478 U.S. at 8-10). This quote supports our view that our Supreme Court did not intend its interchangeable use of "voir dire" and "jury selection" in *Paumier* and *Wise* to mean that these two terms are functionally equivalent or that its holdings in the voir dire context provide precedential authority for any and all phases of the broader "jury selection" process we describe here.

[11] Similarly, the vast majority of Washington cases finding a violation of the public trial right have all involved the public's exclusion from voir dire or a similar proceeding amounting to its functional equivalent, where individual jurors are examined for case-specific reasons and counsel and the court have the opportunity to exercise peremptory and/or for-cause juror challenges. *See. Strode*, 167 Wn.2d 222 (individual voir dire of jurors in chambers violated public trial right); *Brightman*, 155 Wn.2d 506 (public trial right violated when entire voir dire closed to all spectators); *In re Orange*, 152 Wn.2d 795 (same); *State v. Slert*, 169 Wn. App. 766, 282 P.3d 101 (2012) (violation of public trial right where counsel and the court excused four jurors "for cause" in chambers based on information contained in the jurors' questionnaires, which were specifically designed to test the jurors' fitness to serve on Slert's case), *petition for review filed*,

however, address or purport to characterize as "courtroom closures" the entire jury selection spectrum (from initial summons to jury empanelment); nor did these cases address any preliminary administrative component of the jury selection process, such as the bailiff's ill juror excusal component at issue here.

Accordingly, we do not interpret "jury selection" and "voir dire" as coextensive; rather,

---

No. 87844-7 (Wash. Sept. 7, 2012); *State v. Leyerle*, 158 Wn. App. 474, 242 P.3d 921 (2010) (individual voir dire of juror in court hallway violated public trial right); *State v. Bowen*, 157 Wn. App. 821, 239 P.3d 1114 (2010) (individual voir dire of jurors in chambers violated public trial right); *State v. Erickson*, 146 Wn. App. 200, 189 P.3d 245 (2008) (individual voir dire of jurors in jury room violated public trial right), *petition for review filed*, No. 82050-3 (Wash. Sept. 2, 2008); *State v. Duckett*, 141 Wn. App. 797, 173 P.3d 948 (2007) (same), *petition for review filed*, No. 80965-8 (Wash. Dec. 11, 2007).

Wilson cites no case holding that the public trial right attaches to preliminary administrative juror excusals, such as those at issue here, or to any component of the jury selection process outside voir dire; nor are we independently aware of any such case. Wilson does, however, cite our split decision in *Slert* as support for his argument that his public trial right had attached to these administrative juror excusals because (1) the prospective jurors had been given a juror questionnaire that asked information specific to his case, and (2) the jurors were instructed that they were under oath when they completed it. In *Slert*, the trial court gave prospective jurors a questionnaire asking about the jurors' familiarity with publicity from Slert's two prior trials, both of which had resulted in convictions. *Slert*, 169 Wn. App. at 770-71. Based on the jurors' questionnaire responses, the trial court and counsel then held an in-chambers conference and excused four jurors from the jury pool "for cause." *Slert*, 169 Wn. App. at 771. Under these specific facts, we held that (1) the in-chambers conference was "part of the jury selection process to which the public trial right applied" because the jurors had been excused for "case-specific reasons" "based on their questionnaire answers"; and (2) the trial court had violated Slert's right to a public trial because it did not conduct a *Bone-Club* analysis before excusing the jurors outside the courtroom. *Slert*, 169 Wn. App. at 774-75. Although the trial court in Wilson's case also gave the prospective jurors a questionnaire that asked information specific to his case, the bailiff did not excuse the two jurors "for cause," for any reasons related specifically to Wilson's case, or based on any information contained in their questionnaire responses. Thus, the facts in *Slert* are distinguishable, and its holding does not apply here.

we distinguish between them.[12] We hold that the bailiff's two pre voir dire excusals of ill jurors does not fall within a specific category or trial proceeding that *Paumier*, *Wise*, or any other Supreme Court case has already recognized as implicating a defendant's public trial right. Accordingly, we next apply the second test, experience and logic.

2. Administrative juror excusals do not meet *Sublett* "Experience and Logic" test

As the *Sublett* Court noted, "the United States Supreme Court formulated and explained the experience and logic test to determine whether the core values of the public trial right are implicated." *Sublett*, 176 Wn.2d at 72-73 (citing *Press* II, 478 U.S. at 8-10). Under this experience and logic test, "the experience prong . . . asks 'whether the place and process have historically been open to the press and general public.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8); *In Re Pers. Restraint of Yates*, No. 82101-1, 2013 WL 991900, at *9 (Wash. Mar. 14, 2013). "The logic prong asks 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8); *Yates*, 2013 WL 991900 at *9. If the answer to *both* prongs of the experience and logic test is yes, the public trial right "attaches" and the trial court must consider the *Bone-Club* factors on the record before closing the proceeding to the public. *Sublett*, 176 Wn.2d at 73.

In applying the logic prong, courts should consider "the values served by open courts." *Sublett*, 176 Wn.2d at 74. One manner of considering these values is by comparing the

---

[12] In our view, the general process of "jury selection" begins when the trial court issues the juror summons to members of the public, some of whom do not respond and some of whom respond but who, for various hardship reasons unrelated to the specific case to be tried, are unable to serve at that time. In contrast, "voir dire" is a later-occurring component of the broader "jury selection" process, which provides the parties in a specific case with an opportunity to question prospective jurors in the open public courtroom to examine them for biases and to obtain a fair and impartial jury to try their specific case.

challenged proceeding's nature with the nature of the criminal trial itself: For example, do the same criminal rights attach (rights to appear, to cross-examine witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence)? What is the importance of the challenged proceeding in the overall trial context? And, is the jury present during the challenged proceeding? *Sublett*, 176 Wn.2d at 74.

> But not every case will fit cleanly within a comparison between the proceeding at issue and trial in general, so the trial or reviewing court must consider whether openness will "enhance[ ] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system."

*Sublett*, 176 Wn.2d at 74-75 (alteration in original) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508, 104 S. Ct. 819, 78 L. Ed. 2d 629 (1984) (*Press* I)).

### a. "Experience" prong

Wilson fails to show that the bailiff's excusing two jurors for illness-related reasons before voir dire began was a proceeding that implicated his public trial right. Wilson has not cited any case holding that (1) preliminary juror excusals for illness or other juror hardships have historically been open to the public or (2) the public trial right attaches to any component of jury selection that does not involve "voir dire" or a similar jury selection proceeding involving the exercise of "peremptory" challenges and "for cause" juror excusals.[13] Nor does there appear to be any cases so holding.

---

[13] Again, we note that Wilson relies on *Slert* and argues that his public trial rights had attached when the bailiff excused the two ill jurors because (1) the trial court administered a juror questionnaire and (2) the jurors signed this questionnaire under oath. But again, unlike the facts in *Slert*, the bailiff here did not excuse the jurors "for cause" based on the information contained in their questionnaires.

The criminal rules of procedure, RCW 2.36.100(1), and case law clearly demonstrate that (1) "jury selection" and "voir dire" are separate but related concepts; and (2) the public trial right historically has *not* attached to certain statutory juror excusals, such as hardships under RCW 2.36.100(1), which the trial court may make administratively before voir dire begins. For example, the criminal rules of procedure describe "jury selection" and "voir dire" in different sections, indicating that our courts have historically distinguished between these proceedings. *Compare* CrR 6.3 (describing administrative components of jury selection), *with* CrR 6.4(b) (describing juror voir dire as involving peremptory and for cause juror challenges).

CrR 6.3, entitled "Selecting the Jury," also provides:

> When the action is called for trial, the jurors shall be selected at random from the jurors summoned who have appeared *and have not been excused.*

CrR 6.3 (emphasis added). The original 1973 version of this rule made clear that a court clerk could preliminarily excuse some jurors appearing for jury service and that such administrative juror excusals would occur *before* voir dire began.[14] CrR 6.3 does not describe the procedures that a trial court or its clerk must follow before excusing prospective jurors under this rule. But both the current version of CrR 6.3 and its original language contemplate administrative excusal of some jurors appearing for service before voir dire by counsel and before trial begins in the

---

[14] Former CrR 6.3 (1973) read:

> When the action is called for trial, the clerk shall prepare separate ballots containing the names of the jurors summoned who have appeared and not been excused, and deposit them in a box. *He shall draw the required number of names for purposes of voir dire examination.*

(Emphasis added).

public courtroom.[15] This CrR 6.3 pretrial administrative juror-excusal procedure contrasts starkly with CrR 6.4(b), which describes "voir dire" as a process where the trial court and counsel ask prospective jurors questions to assess their ability to serve on the defendant's particular case and to enable counsel to exercise intelligent "for cause" and "peremptory" juror challenges. CrR 6.4(b).[16] The record here shows that the trial court was engaged in the administrative component of the jury selection process, as described in CrR 6.3, when the bailiff excused the two ill jurors before the voir dire component commenced.

Furthermore, both the Legislature and our Supreme Court have acknowledged that a trial court has discretion to excuse jurors outside the public courtroom[17] for statutorily-defined reasons, provided such juror excusals do not amount to for-cause excusals or peremptory challenges traditionally exercised during voir dire in the courtroom. Under RCW 2.36.100(1), the trial court has "broad discretion" to excuse prospective jurors "upon a showing of undue

---

[15] See also Yates, in which the Supreme Court rejected an argument that "court personnel's [pretrial administrative] exclusion of jurors without Yates's participation" violated his due process rights to a jury drawn from a fair cross section of the community. Yates, 2013 WL 991900 at *5-6.

[16] CrR6.4(b) provides:

> A voir dire examination shall be conducted *for the purpose of discovering any basis for a challenge for cause and for the purpose of gaining knowledge to enable an intelligent exercise of peremptory challenges.* The judge shall initiate the voir dire examination by identifying the parties and their respective counsel and by briefly outlining the nature of the case. *The judge and counsel may then ask the prospective jurors questions touching on their qualifications to serve as jurors in the case,* subject to the supervision of the court as appropriate to the facts of the case.

(Emphasis added).

[17] See, e.g., Yates, 2013 WL 991900 at *5, citing with approval Pierce County Superior Court's juror excusal and deferral processes.

*hardship*, extreme inconvenience, public necessity, *or any reason deemed sufficient by the court.*" RCW 2.36.100(1) (emphasis added); *State v. Rice*, 120 Wn.2d 549, 560, 844 P.2d 416 (1993). Consistently, our Supreme Court has held that this statute allows a trial court to delegate hardship and other administrative juror excusals to clerks and other court agents, provided that the excusals are not the equivalent of peremptory or for cause juror challenges. *Rice*, 120 Wn.2d at 561; *see also State v. Tingdale*, 117 Wn.2d 595, 599-600, 817 P.2d 850 (1991).[18]

Although our Supreme Court has not expressly addressed whether a defendant has a public trial right to have juror excusals under RCW 2.36.100(1) conducted in the public courtroom, the facts in *Rice* suggest that the public trial right does not attach to such administrative juror excusals. For example, in *Rice*, the county clerk had excused prospective jurors for hardship and other statutory reasons by "telephone" and after receiving the jurors' "jury selection questionnaires." *Rice*, 120 Wn.2d at 560. Such telephone excusals would likely have been conducted outside the public courtroom; yet our Supreme Court made no mention of the defendant's potential public trial rights. RCW 2.36.100(1)'s legislative history also strongly suggests that such administrative juror excusals conducted by a court agent are not proceedings

---

[18] *Accord State v. Langford*, 67 Wn. App. 572, 583-84, 837 P.2d 1037 (1992), *review denied*, 121 Wn.2d 1007, *cert. denied*, 510 U.S. 838 (1993).

No. 41990-4-II

that historically have been open to the public.[19]

Similarly, here, the bailiff excused two jurors under RCW 2.36.100(1), solely for illness-related reasons, before the venire was brought into the courtroom for voir dire. These two excusals complied with *Rice* and with the trial court's written policy, which allows administrative staff to excuse jurors pretrial for illness-related reasons. Although the prospective jurors were also given juror questionnaires with substantive information about Wilson's case, nothing in the record indicates that the bailiff excused the jurors "for cause" based on any information contained in their questionnaire responses. Given the weight of authority, we conclude that Wilson fails to show that the bailiff's two administrative juror excusals under RCW 2.36.100(1) were improper or that they constituted a proceeding that has been historically

---

[19] RCW 2.36.100(1)'s legislative amendments strongly suggest that even if the public trial right once applied to such statutory juror excusals, the right has been eroded or eliminated overtime. RCW 2.36.100(1) has existed in its current form since 1979, although the statute itself dates back to 1909. See LAWS OF 1909, ch. 73, § 7; LAWS OF 1979, 1st ex. sess, ch. 135, § 3. The law as it existed in 1909 allowed any juror summoned to be excused from jury service "*when his own health requires*, on account of death in his family, or if illness in his family [is] of such character that he is required to be in attendance thereupon." LAWS OF 1909, ch. 73, § 7 (emphasis added). The 1909 statute further provided:

> Any person applying to be excused from jury service for any of the causes herein specified, *shall* be placed upon oath (or affirmation) to testify truly in all respects as to the cause for such excuse, and that he will answer truly any question put to him by the judge with respect thereto.

LAWS OF 1909, ch. 73, § 7 (emphasis added).

Two years later, in 1911, the Legislature amended the statute, substituting the word "shall" in the 1909 statute with the word "may." LAWS OF 1911, ch. 57, § 7. Thus, by 1911, it was no longer required, but only permissible, for a juror claiming a statutory excusal to "be placed upon oath or affirmation to testify truly . . . as to the cause for such excuse." LAWS OF 1911, ch. 57, § 7. The next amendment occurred in 1979, and it deleted the juror oath/affirmation requirement entirely. And in 1993, our Supreme Court interpreted the statute to allow delegation of RCW 2.36.100(1)'s statutory excusals to clerks and other court agents. *Rice*, 120 Wn.2d at 560-61. This legislative history and later case law interpretation show that the public trial right has eroded (not increased) over time, at least with respect to hardships and other statutory excusals.

16

open to the public. Thus, he fails to satisfy the first, "experience" prong of the *Sublett* experience and logic test.[20]

### b. "Logic" prong

Wilson also fails to satisfy the second, logic prong of the test. He has not shown that "'public access plays a significant positive role in the functioning of the particular process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press* II, 478 U.S. at 8). As we have just noted, RCW 2.36.100(1) gives the trial court and its delegated agents "broad discretion" to excuse members of the jury pool for "undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court." RCW 2.36.100(1) (emphasis added); *Rice*, 120 Wn.2d at 560-62. The bailiff acted within her delegated authority when she excused the two jurors solely for the illness-related reasons allowed by statute.

Furthermore, unlike the for-cause excusals and peremptory challenges that the parties explore during voir dire, the bailiff's pre voir dire juror excusals here were not a "proceeding so similar to the trial itself that the same rights attach, such as the right to appear, to cross-examine witnesses, to present exculpatory evidence, and to exclude illegally obtained evidence." *Sublett*, 176 Wn.2d at 77. Because the bailiff also had broad discretion to excuse members of the jury pool for "hardship" or "any reason deemed sufficient [to] the court," Wilson has not shown that openness during this pre voir dire juror excusal proceeding would have "'enhance[d] both the basic fairness of the criminal trial and the appearance of fairness so essential to public

---

[20] We could end our analysis of the public trial issue with Wilson's failure to meet the first prong of the test. But because this case involves a new interpretation of the Supreme Court's recent adoption of the experience and logic test in *Sublett*, we address the second prong of the test as well.

confidence in the system.'" RCW 2.36.100(1); *Sublett*, 176 Wn.2d at 75 (some alteration in original) (quoting *Press* I, 464 U.S. at 508). We, therefore, conclude that Wilson fails to satisfy the second prong of the experience and logic test.

Because Wilson fails to meet both prongs of *Sublett*'s "experience and logic" test,[21] we hold that (1) his public trial right was not implicated when the bailiff excused the two jurors solely for illness-related reasons before voir dire began; and (2) thus, no courtroom closure occurred, no *Bone-Club* factors applied, and the trial court did not violate Wilson's public trial right.

## II. RIGHT TO BE PRESENT

We next address whether the trial court's pre voir dire administrative juror excusals violated Wilson's constitutional right to be present at a critical stage of his proceeding. We hold that it did not.

We review de novo whether a trial court violated a defendant's constitutional right to be present. *State v. Irby*, 170 Wn.2d 874, 880, 246 P.3d 796 (2011). The state and federal constitutions guarantee a defendant the "fundamental right to be present at all critical stages of a trial." *Irby*, 170 Wn.2d at 880; *see also United States v. Gagnon*, 470 U.S. 522, 526, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. The right to be present, however, is not absolute. *Irby*, 170 Wn.2d at 881. "'[T]he presence of a defendant is a condition of due process *to the extent that a fair and just hearing would be thwarted by his absence.*'" *Irby*, 170 Wn.2d at 881 (emphasis added) (quoting *Snyder v. Massachusetts*, 291

---

[21] *See Yates*, holding in the personal restraint context that the burden is on the defendant to satisfy both prongs of the *Sublett* experience and logic test in order to show a courtroom closure requiring a *Bone-Club* analysis. *Yates*, 2013 WL 991900 at *9.

U.S. 97, 105–07, 54 S. Ct. 330, 78 L. Ed. 674 (1934), *overruled in part on other grounds sub nom. Malloy v. Hogan*, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964)). Therefore, a defendant has the right to be present "'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Irby*, 170 Wn.2d at 881 (quoting *Snyder*, 291 U.S. at 105-06). But he "does not have a right to be present *when his . . . 'presence would be useless, or the benefit but a shadow.'*" *Irby*, 170 Wn.2d at 881 (emphasis added) (quoting *Snyder*, 291 U.S. at 106-07).

Again, Wilson baldly asserts that (1) the trial court violated his right to be present because this right "encompasses jury selection," and (2) the trial court was engaged in the jury selection process for which he had a constitutional right to be present when the bailiff excused the two ill jurors before voir dire. Br. of Appellant at 34. Again, we disagree.

Our Supreme Court recently addressed which portions of the jury selection process a defendant has a constitutional right to attend.[22] *Irby*, 170 Wn.2d at 882-84. In *Irby*, the Supreme Court reaffirmed the rule that "the due process right to be present 'extends to jury *voir dire.*'" *Irby*, 170 Wn.2d at 883 (emphasis added) (quoting *State v. Wilson*, 141 Wn. App. 597, 604, 171

---

[22] Irby was on trial for first degree burglary and first degree murder. *Irby*, 170 Wn.2d at 877. The trial court required prospective jurors to complete a questionnaire seeking information about their familiarity with the substantive issues in Irby's case, including whether any of the jurors' family members had been murdered. *Irby*, 170 Wn.2d at 877-78. Based on the jurors' questionnaire responses, the trial court and counsel used e-mail to excuse seven members of the jury pool "for cause," specifically related to issues involved in Irby's case. *See Irby*, 170 Wn.2d at 877-78. The Supreme Court held that (1) the e-mail exchange between the trial court and counsel was a portion of the jury selection process that Irby had a constitutional right to attend, and (2) the trial court violated his right to be present by excusing jurors for cause in his absence. *Irby*, 170 Wn.2d at 882-84.

P.3d 501 (2007)). The Supreme Court also addressed whether the right to be present also attaches to additional portions of the jury selection.[23] *Irby*, 170 Wn.2d at 883-84.

The Court distinguished between (1) pre voir dire administrative excusals of potential jurors based on their "general qualifications" to serve on *any* jury and (2) questioning and excusing prospective jurors based on their "fitness to serve [in the defendant's] particular case," such as individual juror evaluations and dismissals "for cause." *Irby*, 170 Wn.2d at 882. In making this distinction, the Court relied on two cases holding that hardships and other preliminary administrative juror excusals do not implicate a defendant's right to be present: *Irby*, 170 Wn.2d at 882 (citing *Wright v. State*, 688 So. 2d 298, 300 (Fla. 1996) (distinguishing general jury qualification from jury qualification to try a specific case and holding that general qualification process is not critical stage requiring the defendant's presence); and *Commonwealth v. Barnoski*, 418 Mass. 523, 530, 531, 638 N.E.2d 9 (1994) (distinguishing "preliminary hardship colloqu[y]" from "individual, substantive[ ] voir dire")) (alteration in original) (internal quotation marks omitted).

---

[23] We note that in *Irby* the Supreme Court also appears to have used the terms "jury selection" and "voir dire" interchangeably in setting out the basic rules involving the right to be present, although the Court was obviously talking about and discussing cases involving jury voir dire. *See Irby*, 170 Wn.2d at 883-84 (citing *United States v. Gordon*, 829 F.2d 119, 124 (D.C. Cir. 1987) and *Gomez v. United States*, 490 U.S. 858, 873, 109 S. Ct. 2237, 104 L. Ed. 2d 923 (1989)). Again, we do not view these two terms as synonyms and caution against using them as such.

Here, the trial court's bailiff did not excuse the two ill or medically incapacitated jurors "for cause" or after evaluating their "fitness to serve"[24] on Wilson's case in particular.[25] Rather, the record shows that the bailiff acted purely administratively when she excused the two jurors for legitimate medical reasons, including that one of the jurors was on "narcotic pain killers" and having "problems standing and sitting." VRP (Feb. 14, 2011) at 25, 26. As we have already explained, these excusals by the bailiff were consistent with the trial court's broad discretion under RCW 2.36.100(1) to delegate to court personnel the authority to excuse prospective jurors administratively for "undue hardship, extreme inconvenience, public necessity, or any reason deemed sufficient by the court." RCW 2.36.100(1); *Rice*, 120 Wn.2d at 560-62.

Furthermore, Wilson has not shown that his presence for these administrative excusals bore any "'relation, reasonably substantial, to the ful[l]ness of his opportunity to defend against the charge'" or "'that a fair and just hearing would be thwarted by his absence.'" *Irby*, 170 Wn.2d at 881 (quoting *Snyder*, 291 U.S. at 105–08). These jurors were not excused with reference to Wilson or the issues in his case; on the contrary, the excusals protected the health of the other jurors, the court staff, the public, and the parties involved in Wilson's trial. And,

---

[24] *Irby*, 170 Wn.2d at 882.

[25] Although the trial court gave prospective jurors a jury questionnaire specific to his case, nothing in the record indicates that the bailiff based her excusals on such information.

because the bailiff or trial court had discretion to excuse these jurors for "any reason deemed sufficient by the court,"[26] Wilson's presence during these juror excusals would have been "'useless, or the benefit but a shadow.'" *Irby*, 170 Wn.2d at 881 (quoting *Snyder*, 291 U.S. at 106-07).

We hold that Wilson did not have a constitutional right to be present for these pre voir dire administrative juror excusals and that the trial court did not err by allowing the bailiff to excuse these jurors in Wilson's absence.[27] We affirm.[28]

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[26] RCW 2.36.100(1).

[27] Nevertheless, we further note that the trial court offered to bring the excused jurors to the court room for voir dire at Wilson's request; this offer would have cured the alleged violation about which Wilson now complains on appeal. But Wilson did not accept this offer.

[28] Analyzing Wilson's other arguments in the unpublished portion of this opinion also results in affirmance.

SYNOPSIS OF UNPUBLISHED PORTION OF OPINION

Wilson next argues that (1) the trial court erred in admitting expert testimony under *Frye*[29] because it was a "nearly explicit"[30] improper opinion on Wilson's guilt, (2) his trial counsel provided ineffective assistance in failing to introduce evidence that the police had investigated another child for having molested AH when she was three years old, (3) the trial court violated Wilson's due process right to notice of the charges against him when it allowed the State to amend its information on the third day of trial, (4) the prosecutor committed misconduct by cross-examining Wilson about "sexual issues"[31] in his first marriage without offering extrinsic evidence to prove these facts and by shifting the burden of proof during closing argument, and (5) the trial court's special verdict unanimity instruction violated his due process and jury trial rights and requires resentencing. Wilson's arguments challenging his convictions fail; and we affirm. Because he cannot appeal the length of a properly calculated standard-range sentence, we dismiss that part of his appeal.

FACTS

I. CHILD RAPE CHARGES

Joel Wilson had a romantic relationship with AH's mother for nine years. He moved in with AH's mother and her three children when AH was approximately six years old and lived with them from 2003 to June 2008. Wilson started touching AH in a sexual manner when she

---

[29] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).

[30] Br. of Appellant at 3.

[31] VRP (Feb. 17, 2011) at 30.

was around seven years old by caressing her buttocks and her thighs and by moving her near his groin whenever she sat on his lap.

According to AH, when she was seven years old, Wilson also began coming into her bedroom three or four nights a week, saying that he had a "bad back" and that he needed to sleep with her because she had a "firmer" bed than her mother's bed. VRP (Feb. 15, 2011) at 31; VRP (Feb. 16, 2011) at 19. Wilson would undress AH and himself and have sexual intercourse with her, using his penis, his finger, and/or a vibrator; he also made her give him oral sex. Wilson repeatedly had sexual intercourse with AH in this fashion until she was 11 years old.

Around June 2009, AH disclosed Wilson's sexual abuse to her father's girlfriend. AH's father contacted law enforcement, and a police investigation ensued. AH was taken to a hospital in Bellingham for a sexual assault examination, which nurse practitioner Margaret Jahn performed and videotaped. AH's exam showed she had deep posterior "notches" on her hymen consistent with past vaginal penetration. VRP (Feb. 15, 2011) at 158, 171. The police arrested Wilson for child rape.

## II. PROCEDURE

The State charged Wilson with 13 counts of first degree child rape. The State also sought an exceptional sentence under RCW 9.94A.535(3)(g),[32] alleging that each of Wilson's offenses was "part of an ongoing pattern of sexual abuse against the same victim . . . manifested by

---

[32] The legislature amended this statute several times during the charging period for Wilson's crimes (2002-2008). Its 2005 amendments made this aggravating factor one that the jury, rather than the trial court, needed to find beyond a reasonable doubt. This provision, however, has not changed in substance since 2005. Following this 2005 procedure, the trial court here, required the jury to return special verdicts on this aggravating factor. Accordingly, we cite the current version of this statute.

multiple incidents over a prolonged period of time." Clerk's Papers (CP) at 25. During trial, over Wilson's objection, the trial court granted the State's CrR 2.1(d) motion to amend the information to substitute the word "penis" for "vibrator" on three counts. VRP (Feb. 16, 2011) at 36. This amendment conformed Wilson's charges to AH's testimony that (1) Wilson had penetrated her with a vibrator only "once or twice,"[33] in contrast with the three or four times she had reported during the police investigation; and (2) he had penetrated her with his penis three or four nights a week until she was 11 years old. VRP (Feb. 16, 2011) at 36.

## A. Motion in Limine

The State moved in limine to exclude evidence that AH may have been sexually molested by a neighborhood child when she was three years old. The State argued that this evidence was irrelevant to Wilson's case because (1) AH did not have any "independent recollection" of the event, (2) she did not know the perpetrator's name, and (3) she stated that Wilson was the only person who had touched her inappropriately. VRP (Feb. 14, 2011) at 9. Furthermore, the unconfirmed allegations against this neighborhood child had not involved any acts of vaginal penetration. Wilson did not object to the State's motion to exclude this evidence, arguing instead that the trial court should postpone ruling until it heard the evidence at trial.

The trial court granted the State's motion, but it stated that it would revisit its order during trial if it appeared that such testimony might have some relevance in Wilson's case. Neither the State nor Wilson sought to admit this evidence at trial. Thus, the jury did not hear this testimony.

---

[33] VRP (Feb. 15, 2011) at 64.

25

B. Trial Testimony

Both the State and Wilson called expert witnesses to interpret nurse practitioner Jahn's videotape of AH's sexual assault examination.

1. Dr. Sugar

The State called Dr. Naomi Sugar, Medical Director of the Harborview Center for Sexual Assault. According to Dr. Sugar, adolescent girls like AH may have naturally-occurring superficial "notches" on their hymens, but it is much less common for them to have "deep notches" on the posterior region of their hymens without having had sexual intercourse. VRP (Feb. 15, 2011) at 151. According to Dr. Joyce Adams' studies, which were generally accepted in the medical community, "deep notches" on the posterior hymen were "more frequently" found in girls who had previously had sexual intercourse. VRP (Feb. 15, 2011) at 152, 153.

After laying this foundation for her opinion, Dr. Sugar testified that AH had two symmetrical "deep folds" or "clefts" on her posterior hymen, which appeared to Dr. Sugar to be "deep notches." VRP (Feb. 15, 2011) at 157, 159. She could not tell with certainty that they were "deep notches" because when nurse practitioner Jahn had performed AH's sexual assault examination, she had not used a Q-tip to separate the folds to see if there were holes in the tissue (indicating notches) and, if so, to measure the notches' depth because this procedure was apparently too painful for AH to tolerate. VRP (Feb. 15, 2011) at 165. Although not a "hundred percent" positive that the tissue examined had deep notches, Dr. Sugar emphasized that the "symmetry" of the folds or notches on the tissue was more common in girls who had previously had sexual intercourse. VRP (Feb. 15, 2011) at 159, 165.

Wilson objected when the State then asked Dr. Sugar if she had an opinion with a "reasonable degree of medical certainty" about whether the findings she had observed on AH's hymen were "consistent with a history of repeated vaginal penetration since age 7." VRP (Feb. 15, 2011) at 159. Outside of the jury's presence, Wilson then examined Dr. Sugar about the meaning of the phrase "most consistent," which she had used in her expert report to describe the likelihood that AH had experienced past vaginal penetration. VRP (Feb. 15, 2011) at 160. Dr. Sugar testified that (1) the phrase "most consistent" was a medical phrase; (2) although the phrase was not "diagnostic," it was "enough [on which] to base a medical opinion"; (3) based on her experience as a doctor, there was a "reasonable medical certainty" that the folds on AH's hymen were "deep notches"; and (4) experts disagree about how to measure whether a notch is considered "deep." VRP (Feb. 15, 2011) at 160, 161, 165, 176. Wilson moved to exclude Dr. Sugar's testimony, arguing that her opinion that the results of AH's exam were "[most] consistent" with past vaginal penetration were inadmissible under the *Frye* test. VRP (Feb. 15, 2011) at 170. Overruling the objection, the trial court allowed Dr. Sugar to testify.

Dr. Sugar then testified that AH's exam was "consistent" with past repeated vaginal penetration. VRP (Feb. 15, 2011) at 171. She based her opinion on (1) Dr. Adams' studies, which showed "deep notches" "correlated fairly well, [but] not perfectly at all" with prior penetrating injury to the vagina; and (2) her inability to tell precisely whether the folds were deep notches without separating the tissue. VRP (Feb. 15, 2011) at 172. The trial court overruled Wilson's objection to the State's asking Dr. Sugar what the word "consistent" meant in terms of medical percentages. VRP (Feb. 15, 2011) at 191. Dr. Sugar testified that, in her opinion, it was

"60 to 85 percent" likely that the deep notches on AH's hymen were due to past vaginal penetration. VRP (Feb. 15, 2011) at 192.

### 2. Dr. Griest

Wilson called Dr. Karen Griest, a forensic pediatric pathologist who had also viewed the videotape of AH's exam. Dr. Griest admitted that medical studies had shown that "deep notches" correlated with past vaginal penetration and that Dr. Adams' research in this area was "generally accepted" by the medical community. VRP (Feb. 16, 2011) at 68, 81. She also testified that measuring notches could be "difficult," especially when working with young children like AH, and that the best method for measuring notches was "a matter of dispute" among experts. VRP (Feb. 16, 2011) at 69. In Dr. Griest's opinion, AH's exam showed three "grooves" or "folds" on the posterior region of AH's hymen that could have been "notches"; but Dr. Griest could not offer a definitive opinion without separating the tissue to see if it had a hole in it and without measuring the notch. VRP (Feb. 16, 2011) at 66, 67, 71.

### 3. AH and her mother

AH testified in detail about Wilson's sexual abuse during the years he had lived with her family. She specifically testified that, when she was between the ages of 7 and 10, Wilson had sexual intercourse with her at least 3 or 4 nights a week. Although during the police investigation she had reported that Wilson had inserted a vibrator into her vagina "three or four" times, she testified at trial that this had occurred only "[o]nce or twice." CP at 61; VRP (Feb. 15, 2011) at 64.

AH's mother testified that, of her three children, AH was Wilson's favorite and that he had "bonded faster" and had gotten "closer" to her than he had with AH's mother's other

children. VRP (Feb. 16, 2011) at 23. AH's mother also testified that she and Wilson had a healthy sexual relationship until he injured his back in 2005, after which point he stopped having sex with her and started sleeping in AH's bedroom a couple nights a week when his back hurt. Around this time, AH started "routinely masturbat[ing]"; AH's mother had twice found her vibrator in AH's bedroom. VRP (Feb. 16, 2011) at 28.

### 4. Wilson

Wilson testified that he had occasionally slept in AH's bedroom with his clothes on. But he denied all of the sexual abuse allegations against him, asserting that he had never had "sexual contact," "sexual intercourse," or "oral sex" with AH. VRP (Feb. 17, 2011) at 28, 29. He also testified that he had injured his back in 2005, rendering him physically incapable of having sex. On cross-examination, the State explored the veracity of Wilson's testimony about his back injury and asked him questions about his sexual relationship with his first wife, whom he had divorced before his back injury in 2005:

> [STATE:] Isn't it true that your first marriage ended because you weren't having sex with your wife?
> [WILSON:] No.
> [STATE:] Okay. Isn't it true that after the birth of her child that you only had sex about twice in your first marriage?

VRP (Feb. 17, 2011) at 29-30 (emphasis added). Wilson objected to this question as "totally irrelevant," to which the prosecutor responded:

> [STATE:] *I think actually it is [relevant] and if his testimony is it was only because of his back injury that the sexual issues arose, it's pretty well that was a significant cause in the break up of his first marriage.* I think it's fair game at this point.
> [WILSON:] That has nothing to do with the price of tea in China, Your Honor.
> [COURT:] I will allow this briefly.
> [STATE:] Why did your first marriage break up?

VRP (Feb. 17, 2011) at 30 (emphasis added). The trial court sustained Wilson's objection to this last question as "absolutely irrelevant." VRP (Feb. 17, 2011) at 30. The State did not revisit this subject again during trial.

### C. Closing Argument; Special Verdict Instruction

During closing, Wilson repeatedly argued that the State had not met its burden of proof because the "un-refuted" evidence at trial showed that he was "impotent" and physically incapable of committing the sex crimes charged.[34] VRP (Feb. 17, 2011) at 73. In rebuttal closing argument, the State pointed out that the only evidence to support Wilson's impotent defense was his own self-serving testimony: "First thing I'd like to take issue with the term impossible to have sex, we know from the testimony[,] in 2005 after his back injury he stopped having sex, *he didn't have any medical opinion saying that.*" VRP (Feb. 17, 2011) at 76 (emphasis added).

Wilson objected that this argument shifted the State's burden of proof. The trial court allowed the argument but, at Wilson's request, gave the jury the following curative instruction:

---

[34] More specifically, Wilson argued:

> But then we get to the last and most important part of the evidence, the un-refuted part of the evidence that is that Joel Wilson is impotent. . . . The evidence is un-refuted. *The evidence is un-refuted that since his accident . . . he's not been able to function sexually. Un-refuted. So you got—you [have to] accept that as a fact, a stone cold fact.* So, from the day of that accident, explain for me then . . . how he possibly could have . . . had sexual intercourse, apparently ejaculated in a condom . . . if he's impotent[,] it couldn't have happened. . . . It's impossible.
> [. . .]
> *As soon as you consider [the] un-refuted evidence Joel Wilson can't perform sexually, he is impotent and has been since 2005, you know what your verdict has to be.*

VRP (Feb. 17, 2011) at 73-74, 75-76 (emphasis added).

> Members of the jury, I do want to remind you that in this case the
> *State has the burden of proving the case beyond a reasonable doubt.*
> *[Wilson] does not have any burden to produce evidence in this case.*

VRP (Feb. 17, 2011) at 80-81 (emphasis added).

After closing arguments, the trial court gave the jury separate verdict forms for Wilson's underlying child rape charges and special verdicts forms for his sentencing enhancements based on his having engaged in a pattern of sexual abuse under RCW 9.94A.535(2)(g). The trial court instructed the jury about how to use the special verdict forms, including that all 12 must agree in order to answer the Special Verdict Form.

## D. Verdict and Sentence

The jury found Wilson guilty of all 13 counts of first degree child rape; and for each count, it returned special verdicts that these offenses involved a pattern of sexual abuse on a minor. But the trial court did not use these special verdicts to impose enhanced sentences. Instead, the trial court imposed high-end standard range sentences of 300 months for each count and ran them concurrently. Wilson appeals his convictions and sentences.

## ANALYSIS

### I. EXPERT TESTIMONY

Wilson argues that the trial court erred in admitting Dr. Sugar's expert testimony because (1) her testimony that AH's deep notches were "consistent"[35] with past vaginal penetration was inadmissible under the *Frye* test, and (2) her testimony that it was "60-85 [percent]" likely that AH's deep notches were caused by past vaginal penetration constituted an impermissible opinion on his guilt. Br. of Appellant at 15. These arguments fail.

---

[35] VRP (Feb. 15, 2011) at 171.

## A. Standards of Review

### 1. *Frye* test

We review de novo a trial court's decision to admit expert testimony as meeting the *Frye* test.[36] *State v. Roberts*, 142 Wn.2d 471, 520, 14 P.3d 713 (2000). But as a threshold issue before applying this de novo standard of review, we must determine whether the *Frye* test even applied to Dr. Sugar's expert testimony. The *Frye* test applies only to evidence based on *novel* scientific theories or methods. *See State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996); *State v. Martin*, 169 Wn. App. 620, 626, 281 P.3d 315 (2012). "[T]he *Frye* test is unnecessary if the evidence does not involve new methods of proof or new scientific principles." *In re Detention of Halgren*, 156 Wn.2d 795, 806, 132 P.3d 714 (2006) (citing *State v. Baity*, 140 Wn.2d 1, 10-11, 991 P.2d 1151 (2000); *State v. Ortiz*, 119 Wn.2d 294, 311, 831 P.2d 1060 (1992)).

Here, we are not persuaded that the experts' testimonies were based on "novel" scientific evidence to which the *Frye* test applied. On the contrary, the record shows that both the scientific theory underlying the evidence and the technique or methodology used to implement is generally accepted in the scientific community. *See State v. Gregory*, 158 Wn.2d 759, 829, 147 P.3d 1201 (2006). The testimony showed that the method for measuring hymenal notches was

---

[36] *Frye*, 293 F. at 1013-14. In determining the admissibility of evidence based on *novel* scientific theories or methods, Washington courts use the "general acceptance" test set forth in *Frye*. *State v. Copeland*, 130 Wn.2d 244, 255, 922 P.2d 1304 (1996). The *Frye* test requires only "general acceptance, not *full* acceptance," of a *novel* scientific methods. *State v. Russell*, 125 Wn.2d 24, 41, 882 P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).

generally accepted within the medical community, despite some disagreement between the two

experts here about how to measure deep notches.[37]

More specifically, both medical experts testified that Dr. Joyce's research studies showed

that "deep notches" on a girl's hymen were frequently associated with past vaginal penetration

and that such studies were generally accepted in the medical community. VRP (Feb. 15, 2011)

at 152-53, 155; VRP (Feb. 16, 2011) at 68. Because this "methodology is sufficiently accepted

in the scientific community at large, concerns about the possibility of error or mistakes made in

the case at hand [could] be argued to the factfinder." *State v. Russell*, 125 Wn.2d 24, 41, 882

P.2d 747 (1994), *cert. denied*, 514 U.S. 1129 (1995).[38] We hold, therefore, that the *Frye* test did

---

[37] Moreover, such measurement methodology had no relevance in Wilson's trial because nurse practitioner Jahn had not separated the folds on AH's hymen with a Q-tip and taken any notch measurements during AH's exam. Thus, any question about Dr. Sugar's methodology in determining that AH had "deep notches" on her hymen did not derive from notch measurement. Instead, Dr. Sugar relied on her experience as a medical practitioner. As we describe more below, the accuracy of her medical opinion bore on the weight the jury should give to her testimony, not to its admissibility. *Russell*, 125 Wn.2d at 41.

[38] *See also State v. Young*, 62 Wn. App. 895, 906, 802 P.2d 829, 817 P.2d 412 (1991). In *Young*, Division One (1) distinguished between "the development of a new scientific technique, i.e. 'a novel method of proof' . . . and the development of a body of medical knowledge and expertise"; and (2) held that the *Frye* standard did not apply to expert medical testimony that, in the expert's experience, certain clinical findings were consistent with penetration and abuse. *Young*, 62 Wn. App. at 906 (internal quotation marks omitted) (quoting *People v. Mendibles*, 199 Cal. App. 3d 1277, 1292-93, 245 Cal. Rptr. 553, 562 (1988), *abrogated on other grounds by People v. Soto*, 51 Cal.4th 229, 245 P.3d 410 (2011)). Such clinical findings were instead analyzed under ER 702. Young, like Wilson, had not disputed that the testifying doctor was qualified as an expert. Instead, he challenged the trial court's allowing her testimony about the condition of the victim's genitals, in particular, the expert's opinion that the condition was consistent with sexual abuse, contending that the expert testimony did not meet the *Frye* standard. *Young*, 62 Wn. App. at 906.

Like Dr. Sugar's testimony about the apparent notches in AH's hymen, the testimony of the expert in *Young*

> showed a familiarity with the relevant literature consistent with her opinions, [and
> it] did not involve any new methods of proof or new scientific principles from

not apply here; accordingly, we do not review the trial court's admission of the expert testimony de novo.

## 2. ER 702 and 703

Wilson objected and the trial court ruled that Dr. Sugar's expert testimony was admissible under *Frye*. Wilson did not object and the trial court did not rule, however, on the admissibility of this evidence under ER 702 and ER 703. Nevertheless, we can affirm a trial court's evidentiary ruling on any alternative ground that the record supports. *Johnson v. Dept. of Corrections*, 164 Wn. App. 769, 779, 265 P.3d 216 (2011) (citing *Otis Housing Ass'n Inc. v. Ha*, 165 Wn.2d 582, 587, 201 P.3d 309 (2009)), *review denied*, 173 Wn.2d 1032 (2012).

Having held that the *Frye* test did not apply to Dr. Sugar's expert testimony, we instead review for abuse of discretion whether her testimony was admissible under ER 702 and ER 703. *Roberts*, 142 Wn.2d at 520. A trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Trial courts are afforded broad discretion in deciding whether to admit evidence, including expert testimony. *State v. Olmedo*, 112 Wn. App. 525, 530, 49 P.3d 960 (2002).

---

which conclusions are drawn. Nor did she testify that any single observation proved that sexual abuse had occurred, or that the abuser could be identified, or that any of the findings could only have resulted from abuse. Dr. Jenny merely testified that certain clinical findings existed, and that in her own professional experience those clinical findings were consistent with penetration and abuse.

*Young*, 62 Wn. App. at 906 (footnotes omitted). In *Young*, the court ruled that this testimony was in accord with ER 702 and that the *Frye* standard was inapplicable to Dr. Jenny's testimony. *See also State v. Gribble*, 60 Wn. App. 374, 378-79, 804 P.2d 634 (1991) (admissible under *Frye*—expert testimony that child's attenuated hymen or dilated vaginal opening was "consistent" with sexual abuse, despite lack of diagnostic opinion.)

## B. Admissibility under ER 702 and 703

ER 702, "Testimony by Experts," provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

And ER 703, "Bases of Opinion Testimony by Experts," provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Addressing the admissibility of expert testimony concerning "rape trauma syndrome" in *State v. Black*, the Washington Supreme Court noted three requirements for admissibility of expert testimony under ER 702: (1) The witness must be qualified as an expert; (2) the expert's opinion must be based on an "explanatory theory generally accepted in the scientific community," and (3) the expert testimony must be helpful to the trier of fact. *State v. Black*, 109 Wn.2d 336, 341, 745 P.2d 12 (1987). Dr. Sugar's expert testimony met all three requirements.

First, as in *Black*, Wilson did not challenge Dr. Sugar's expert qualifications. Second, as we explain above in discussing *Frye*, her expert opinion was based on an "explanatory theory generally accepted in the scientific community." *Black*, 109 Wn.2d at 341. Third, despite citing non-compliance with *Frye*, Wilson's objection below essentially focused on the third requirement—whether Dr. Sugar could render a valid medical opinion that was helpful to the jury because (1) nurse practitioner Jahn, who had examined AH, had not used a Q-tip to separate

the folds in AH's hymen; and (2) therefore, Dr. Sugar could not tell with certainty that AH's hymen had a "notch" to measure for determining previous vaginal penetration.

Dr. Sugar's testimony was helpful to the jury in understanding the clinical findings she observed in reviewing the sexual assault examination video and the basis for her medical opinion. Any concern that Dr. Sugar may have made a mistake in applying Dr. Joyce's research to AH's case and in rendering her own expert opinion, however, went only to the weight of her expert testimony, which both parties argued to the jury in closing, not to its admissibility. We hold that the trial court's admission of Dr. Sugar's testimony complied with ER 702 and 703.

### C. No Improper ER 704 Opinion on Guilt

Next, Wilson argues that the trial court violated his right to a jury trial because Dr. Sugar's testimony that it was "60-85 [percent]" likely that the deep notches on AH's hymen were caused by past vaginal penetration was an improper opinion on his guilt. Br. of Appellant at 17. We disagree.

Under ER 704, an expert may not testify about the defendant's guilt, either directly or by inference. *Olmedo*, 112 Wn. App. at 530; *see also* ER 704. "Such an improper opinion undermines a jury's independent determination of the facts, and may invade the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 530-31. An expert's opinion, however, is not objectionable "simply because it embraces an ultimate issue the trier of fact must decide." *State v. Hayward*, 152 Wn. App. 632, 649, 217 P.3d 354 (2009); *see also* ER 704. "'[T]hat an opinion encompassing ultimate factual issues *supports* the conclusion that the defendant is guilty does not make the testimony an improper opinion of guilt.'" *Hayward*, 152

36

Wn. App. at 649 (quoting *City of Seattle v. Heatley*, 70 Wn. App. 573, 579, 854 P.2d 658 (1993), *review denied*, 123 Wn.2d 1011 (1994)).

Dr. Sugar testified that the deep notches on AH's posterior hymen were "consistent" with repeated past vaginal penetration. VRP (Feb. 15, 2011) at 171. Wilson challenged this conclusion and elicited testimony that the "deep notches" could have explanations other than penetration (e.g., natural development). In response, the State asked Dr. Sugar, "Now [the defense] also asked you about possibilities of other things accounting for what you were able to observe. [*I*]*f you had to rank in your opinion the likelihood of past penetrating injury*, would you be able to give that?" VRP (Feb. 15, 2011) at 191-92 (emphasis added). Dr. Sugar first responded that such a ranking would be "fairly arbitrary" and that her conclusion was "not a hundred percent by any means." VRP (Feb. 15, 2011) at 192. After qualifying her opinion, however, she further explained that in her "medical opinion the likelihood that this particular finding [on AH] was due to past penetration is something like . . . 60 to 85 percent." VRP (Feb. 15, 2011) at 192.

Although Dr. Sugar's testimony addressed the ultimate issue of penetration that the jury was required to decide in weighing the evidence of Wilson's child rape charges, her testimony did not include an opinion on his guilt. Instead, she testified only that penetration had occurred. This opinion did not, however, include any discussion about whether *Wilson* had inflicted the "deep notches" on AH's hymen, as opposed to another person. Moreover, Dr. Sugar acknowledged that she was unable to determine *when* AH had sustained her injuries or *how often* penetration had occurred. We hold, therefore, that Dr. Sugar's testimony was not improper under ER 704 and that it did not invade the province of Wilson's jury.

## II. EFFECTIVE ASSISTANCE OF COUNSEL

Wilson next argues that his trial counsel provided ineffective assistance because he did not introduce evidence that a neighborhood child may have touched AH's genitals on the exterior of her clothing when she was three years old. Wilson contends that this evidence was admissible because it helped explain AH's "early onset of . . . frequent masturbation" and the evidence "suggested an explanation for the deep notches" on AH's hymen. Br. of Appellant at 27. We disagree.

### A. Standard of Review

Ineffective assistance of counsel claims present mixed questions of law and fact, which we review de novo. *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). To prove ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987). To prove deficient performance, a defendant must overcome "'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)), *adhered to in part on remand*, 168 Wn. App. 635, 278 P.3d 225 (2012). If counsel's conduct "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Grier*, 171 Wn.2d at 33 (quoting *Kyllo*, 166 Wn.2d at 863). To show prejudice, the defendant must establish that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at

34 (quoting *Kyllo*, 166 Wn.2d at 862). A defendant's failure to prove either prong ends our inquiry. *State v. Hendrickson*, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

### B. Counsel Not Ineffective

Generally, the decision whether to call a particular witness is presumed to be a matter within the realm of legitimate trial tactics. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 742, 101 P.3d 1 (2004). Evidence that a child has previously been sexually abused may be admissible under proper circumstances. *See State v. Carver*, 37 Wn. App. 122, 124, 678 P.2d 842 (1984). Such evidence, however, is still subject to exclusion under "general evidentiary principles of relevance, probative value[,] and prejudice."[39] *Carver*, 37 Wn. App. at 124.

Wilson has not shown deficient performance by his trial counsel because he has not demonstrated admissibility of the unverified prior sexual touching incident. Unlike the facts in *Carver*, where we held admissible under the rape shield statute evidence that a child previously had been sexually abused by another person,[40] the allegations of the neighborhood child's having touched three-year-old AH were largely unsubstantiated: AH did not have an "independent recollection of the event," she did not know the perpetrator's name, and she stated that Wilson was the only person who had touched her inappropriately. VRP (Feb. 14, 2011) at 9. The record also shows that the neighborhood child's touching, if it occurred at all, was only on the *exterior* of AH's clothing and did not involve any vaginal penetration. This evidence, therefore, would

---

[39] A criminal defendant has "'no right, constitutional or otherwise, to have irrelevant evidence admitted' in his or her defense." *State v. Weaville*, 162 Wn. App. 801, 818, 256 P.3d 426 (quoting *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002)), *review denied*, 173 Wn.2d 1004 (2011).

[40] *Carver*, 37 Wn. App. at 124, 126.

not have been probative of or an independent source for the presence of the "deep notches" on AH's hymen, which tended to prove the penetration aspect of the charged rapes.

Because Wilson has not shown that this evidence was admissible or that there was even a competent witness available to testify about such alleged sexual abuse, we hold that Wilson's counsel was not deficient in failing to introduce this evidence at trial. Accordingly, we do not address the prejudice prong of the test in holding that Wilson's ineffective assistance of counsel claim fails.

### III. AMENDED INFORMATION

Wilson also argues that the trial court violated his due process right to notice of the charges against him when, on the third day of trial, it allowed the State to amend its information to substitute the word "penis" for "vibrator" in three counts.[41] This argument also fails.

### A. Standard of Review

We review for abuse of discretion a trial court's decision to grant a motion to amend an information. *State v. Schaffer*, 120 Wn.2d 616, 621–22, 845 P.2d 281 (1993). Under the criminal rules, the trial court may allow the State to amend the information at any time before the verdict as long as the "substantial rights of the defendant are not prejudiced."[42] CrR 2.1(d); *see also Schaffer*, 120 Wn.2d at 621. The defendant has the burden of showing that the amendment prejudiced his substantial rights. *State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982).

---

[41] VRP (Feb. 16, 2011) at 36.

[42] Because the State moved to amend the information during its case in chief, the rule announced in *State v. Pelkey*, 109 Wn.2d 484, 745 P.2d 854 (1987), requiring a per se reversal of the defendant's conviction unless the amendment was to lesser-degree or lesser-included charge, does not apply. *Shaffer*, 120 Wn.2d at 620-21.

40

"The fact a defendant does not request a continuance is persuasive of lack of surprise and prejudice." *Gosser*, 33 Wn. App. at 435.

## B. No Prejudice

Wilson fails to meet his burden here. As the Washington Supreme Court has explained, whether and when an information may be amended will vary with each case. *See Schaffer*, 120 Wn.2d at 621. For example, when a jury is involved and the amendment occurs late in the State's case, impermissible prejudice could be more likely. *Schaffer*, 120 Wn.2d at 621. But impermissible prejudice to the defendant is less likely where, as here, "'the amendment merely specif[ies] *a different manner of committing the crime originally charged.*'" *Schaffer*, 120 Wn.2d at 621 (citations omitted) (quoting *State v. Pelkey*, 109 Wn.2d 484, 490-91, 745 P.2d 854 (1987)).

Here, the State's amended information did not charge any new offenses or add additional child rape counts. Instead, it merely substituted a different *manner* for committing 3 of Wilson's original 13 charged offenses and brought the existing charges into conformity with AH's testimony at trial—that Wilson had committed child rape by using a vibrator on her "once or twice"[43] as opposed to the "four" times originally charged. CP at 61. The amended charges also referenced the same facts and time-period as the original charges, and they did not require Wilson to rebut additional testimony or to defend against new allegations.

---

[43] VRP (Feb. 15, 2011) at 33, 64.

Moreover, Wilson had generally denied *all* of the original charges against him, which had included allegations that he had raped AH by inserting his penis *and* a vibrator into her vagina.[44] Thus, nothing shows that the amendment prejudiced his defense. That Wilson did not request a continuance after the State moved to amend the information underscores that he was neither surprised nor prejudiced by the amendment. Because Wilson fails to show that the State's amended information prejudiced his substantial rights, his due process argument fails.

## IV. PROSECUTORIAL MISCONDUCT

Wilson next argues that the prosecutor committed prosecutorial misconduct by (1) cross-examining him about the "sexual issues"[45] in his first marriage without offering extrinsic evidence to prove these facts, and (2) shifting the burden of proof during rebuttal closing argument when she argued that Wilson "didn't have any medical opinion saying that [he was impotent]" in response to his closing argument.[46] We disagree.

### A. Standard of Review

We review for abuse of discretion trial court rulings based on allegations of prosecutorial misconduct. *State v. Brett*, 126 Wn.2d 136, 174, 892 P.2d 29 (1995). To prove prosecutorial misconduct, the defendant must demonstrate that the prosecutor's conduct was both improper and prejudicial within the context of the entire record and the circumstances at trial. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997); *State v. Miles*, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). Prejudice exists where there is a "substantial likelihood the misconduct

---

[44] We note that the State's original information had included allegations of child rape by both a vibrator (four counts) and Wilson's penis (nine counts). Therefore, Wilson had notice from the beginning that he would need to defend against both manners of committing child rape.

[45] Br. of Appellant at 21 (quoting VRP (Feb. 17, 2011) at 30).

affected the jury's verdict." *Brown*, 132 Wn.2d at 561. Where, as here, a defendant objects at trial on the basis of prosecutorial misconduct, we defer to the trial court's ruling because "'[t]he trial court is in the best position to most effectively determine if prosecutorial misconduct prejudiced [the] defendant's right to a fair trial.'" *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997) (internal quotation marks omitted) (quoting *State v. Luvene*, 127 Wn.2d 690, 701, 903 P.2d 960 (1995)).

During closing argument, a prosecutor has wide latitude to draw reasonable inferences from the facts in evidence and to express such inferences to the jury. *Gregory*, 158 Wn.2d at 860; *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). We review any allegedly improper closing argument statements "within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." *Dhaliwal*, 150 Wn.2d at 578.

## B. Cross-examination without Extrinsic Evidence

The Sixth Amendment to the United States Constitution and article I, section 22 of the state constitution grant criminal defendants the right to confront and to cross-examine adverse witnesses. *State v. Hudlow*, 99 Wn.2d 1, 14-15, 659 P.2d 514 (1983). "A prosecutor may not use impeachment as a means of submitting evidence to the jury that is otherwise unavailable." *Miles*, 139 Wn. App. at 886. A prosecutor may also violate a defendant's right to confrontation if she impeaches a witness by referring to extrinsic evidence that is never introduced at trial. *Miles*, 139 Wn. App. at 886. Where a prosecutor's cross-examination questions refer to extrinsic evidence that is never introduced, a reviewing court must examine "'whether the focus of the

---

[46] VRP (Feb. 17, 2011) at 76.

questioning [was] to impart evidence within the prosecutor's personal knowledge without the prosecutor formally testifying.'" *Miles*, 139 Wn. App. at 887 (quoting *State v. Lopez*, 95 Wn. App. 842, 855, 980 P.2d 224 (1999)).

Wilson's confrontation and prosecutorial misconduct arguments rely almost exclusively on *Miles*. Miles testified that he had been shot in 2001 or 2002; that he had become "incapacitated"; and that he was, therefore, physically incapable of driving a car and committing the crime charged. *Miles*, 139 Wn. App. at 882. On cross-examination, the prosecutor questioned Miles extensively about his participation in specific boxing matches that had occurred while he claimed to have been incapacitated (detailing days, times, and results of the matches), without producing extrinsic evidence of these matches. *Miles*, 139 Wn. App. at 882-85. We held that, under these circumstances, the prosecutor had committed misconduct because there was "no conceivable purpose for asking these questions without rebuttal witnesses . . . other than to impart to the jury the prosecutor's knowledge of fights [the defendant had] participated in without presenting direct evidence of them." *Miles*, 139 Wn. App. at 887. We also noted that "'[i]t was not the questions themselves that were improper; *it was the failure to prove the statements in rebuttal*.'" *Miles*, 139 Wn. App. at 887 (quoting *State v. Babich*, 68 Wn. App. 438, 446, 842 P.2d 1053 (1993)).

*Miles* is distinguishable. Unlike the facts in *Miles*, the prosecutor here did not question Wilson for a significant period of time about the "sexual issues" in his first marriage; thus, it does not appear that the focus of the prosecutor's questions was to impart information within the prosecutor's knowledge. Furthermore, Wilson's counsel twice objected to the prosecutor's

No. 41990-4-II

questions as "irrelevant," which the trial court ultimately sustained.[47] VRP (Feb. 17, 2011) at 30. After this point, the prosecutor discontinued this line of questioning; and she neither attempted to introduce extrinsic evidence of Wilson's sexual issues nor revisited the subject during closing argument.

Furthermore, Wilson cites no authority holding that a prosecutor commits misconduct or violates a defendant's confrontation rights by failing to offer extrinsic evidence in rebuttal *after a trial court has ruled that such evidence is irrelevant and inadmissible.* Therefore, we do not further consider these prosecutorial misconduct and confrontation clause arguments. RAP 10.3(a)(6); *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

## C. Shifting Burden of Proof

A prosecutor may commit misconduct during closing argument by mentioning that the defendant failed to present witnesses or by stating that the jury should find the defendant guilty simply because he did not present evidence to support his defense theory. *State v. Jackson*, 150 Wn. App. 877, 885, 209 P.3d 553 (2009). But "[t]he mere mention that defense evidence is lacking does not constitute prosecutorial misconduct or shift the burden of proof to the defense."[48] *Jackson*, 150 Wn. App. at 885-86. Furthermore, where, as here, the defendant

---

[47] An objection and an appropriate jury instruction may also cure any resulting prejudice. *See e.g., State v. Warren*, 165 Wn.2d 17, 28, 195 P.3d 940 (2008). Wilson, however, did not request a curative instruction, and the record does not show that the trial court gave one.

[48] Nor are all closing argument comments that the defendant failed to produce witnesses an example of impermissible burden shifting. *State v. Blair*, 117 Wn.2d 479, 491, 816 P.2d 718 (1991). In *Blair*, the Washington Supreme Court recognized the "'missing witness'" doctrine, which provides that, under certain circumstances, the prosecutor may comment on the defendant's failure to produce a witness within the defendant's control and it would have been natural for the defendant to produce the witness if the facts known by the witness were favorable to the defendant. *Blair*, 117 Wn.2d at 485-88, 491.

advances a theory to exculpate him, the theory is not immunized from attack. *State v. Contreras*, 57 Wn. App. 471, 476, 788 P.2d 1114 (1990).

On the contrary, the evidence supporting the defendant's theory of the case is subject to the same searching examination as the State's evidence. *Contreras*, 57 Wn. App. at 476. "Remarks of the prosecutor, even if they are improper, are not grounds for reversal if they were *invited or provoked by defense counsel and are in reply to his or her acts and statements*, unless the remarks are not a pertinent reply or are so prejudicial that a curative instruction would be ineffective." *Russell*, 125 Wn.2d at 86 (emphasis added).

Wilson's counsel invited or provoked the prosecutor's rebuttal argument when he (1) strenuously and repeatedly argued during his closing that the jury was *required* to return a not guilty verdict simply because Wilson had provided "un-refuted . . . evidence" that he was "impotent" and, therefore, physically incapable of committing the charged crimes; and (2) asserted that the jury must accept Wilson's testimony about his impotence as a "stone cold fact." VRP (Feb. 17, 2011) at 73-74. Read in this context, the prosecutor's rebuttal argument—that Wilson had presented no medical opinion that he was impotent—reminded the jury that Wilson's testimony about his impotence was largely self-serving and uncorroborated by independent evidence. The prosecutor's rebuttal argument was a fair response to Wilson's closing argument, which had opened the door to this subject; and it was consistent with the jury's duty to weigh all of the evidence and to evaluate the witnesses' credibility, including Wilson's uncorroborated testimony that he was impotent. We hold that in this context, the prosecutor's rebuttal argument

was not misconduct; thus, we need not address the prejudice prong in holding that it did not

amount to prosecutorial misconduct.[49]

## V. STANDARD RANGE SENTENCE

Relying on *Bashaw*[50] and *Ryan*,[51] Wilson argues that we should vacate his sentences and

remand for resentencing because the trial court's special verdict instruction "erroneously

required the jurors to deliberate to unanimity in order to reject the aggravating factor" for his

former RCW 9.94A.535(2)(g) sentencing enhancements. Br. of Appellant at 36. Regardless of

whether this special verdict instruction was error, the issue is moot because the trial court did not

use the jury's special verdicts to enhance his sentences. Instead, the trial court imposed

concurrent high-end standard-range sentences.

The law is clear that a defendant cannot appeal a standard-range sentence, absent

showing procedural irregularities. *See State v. Rice*, 159 Wn. App. 545, 571, 246 P.3d 234

(2011), *aff'd*, 174 Wn.2d 884, 279 P.3d 849 (2012). Aside from his arguments about the moot

---

[49] We further note, however, that, after Wilson objected to the prosecutor's rebuttal argument, the trial court instructed the jury that (1) the State had the "burden of proving the case beyond a reasonable doubt," and (2) Wilson did "not have any burden to produce evidence." VRP (Feb. 17, 2011) at 80-81. An objection and an appropriate jury instruction may cure any resulting prejudice. *See Warren*, 165 Wn.2d at 28.

[50] *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010), *overruled by State v. Nunez*, 174 Wn.2d 707, 285 P.3d 21 (2012).

[51] *State v. Ryan*, 160 Wn. App. 944, 252 P.3d 895 (2011), *overruled by Nunez*.

No. 41990-4-II

special verdict, Wilson alleges no such procedural irregularities; and our review of the record reveals none. Accordingly, we dismiss his appeal of his sentences and affirm his convictions.

Hunt, J.

We concur:

Worswick, C.J.

Van Deren, J.