[Nos. 23691-1-I; 25737-4-I.    Division One.    January 7, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. JACK
YOUNG, *Appellant*.
*In the Matter of the Personal Restraint of* JACK
YOUNG, *Petitioner.*

*Andrew Zinner* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

FORREST, J. — Jack Young appeals from his convictions of first degree statutory rape and indecent liberties. A personal restraint petition has been consolidated with this appeal and the issues will be discussed together. Young claims that the court erred by: admitting medical testimony as to the abused condition of the victim's genitals; denying the appellant's motion to suppress evidence; denying a request for a new trial and new counsel; and failing to find that trial counsel was ineffective. We affirm the conviction subject to the outcome of further proceedings on remand as to ineffectiveness of counsel.

On March 18, 1987, Ray Smith took his 4-year-old granddaughter, J., to see her pediatrician, Dr. Jane Mays. After examining the child's genital area, noting that the vaginal opening appeared to be "somewhat larger than usual", Dr. Mays asked J. what she would do if someone tried to touch her there. J. responded "I do say no." J. told Dr. Mays that "my daddy" had done the touching "last night". Dr. Mays made certain that J. was referring to her father and not to her grandfather, Ray Smith, who was in the examining room and with whom she was then staying.

The following day, Phyllis Schmidt of Children's Protective Services (CPS) interviewed J. at her grandfather's apartment. They played with dolls and a puzzle that

showed body parts, and Schmidt asked many direct questions about sexual abuse. Asked if her daddy hurt her with a stick, J. said yes. Ms. Schmidt asked if she had seen her father nude, and whether his penis was flaccid or erect. She asked the child to demonstrate on dolls what her father had done to her. J. said that he placed his penis in her vagina. Ms. Schmidt asked if appellant had put his penis anywhere near her head or face, and whether anything had come out when this happened. When she answered yes, Ms. Schmidt asked if what came out had a taste, and J. had said it tasted "yucky" and that she had spit it out in the backyard.

On April 8, 1987, at a second visit with Dr. Mays, J. confirmed that her father had touched her. She said that others had touched her too; Steve, Tom and Phil.

In July 1987, J. spontaneously told Karen Lewis, another CPS worker, that she was in foster care "because of what Daddy did to me." After some questions, J. said that her dad had used a stick from a tree and spanked her with it, and put it in her vagina. The child also said that "daddy" had "put his private spot in my mouth." J. said that it happened more than once, and that her mother viewed one of these incidents. Ms. Lewis asked who J. meant by "daddy", and whether he had another name. She responded that his name was Jack. Lewis asked if her grandpa had touched her, and if anyone had ever told J. to say these things. She answered no. On March 7, 1988, Ms. Lewis asked J. what her daddy had done to her. J. pointed to her vagina, and said that he "put a stick up me", and told her that he had put a stick up her anus. In response to more questions, J. disclosed that the stick was kept in the drawer by her daddy's bed.

On September 8, 1987, Dr. Carol Jenny, director of the Harborview Sexual Assault Center, examined J. and took pictures of the child's genitalia with a colposcope. On October 29, 1987, Jack Young was charged with statutory rape and indecent liberties. Police found sticks in Young's dresser close to his bed after a Snohomish County

Superior Court judge issued a search warrant on March 22, 1988, about a year after J. was removed from her home. Prior to Young's trial on November 28, 1988, for statutory rape and indecent liberties against J., the trial court ruled that J.'s hearsay statements were admissible, and denied a motion to exclude medical testimony regarding the condition of J.'s genitals. During trial the court denied a motion in limine to exclude the sticks.

Dr. Jenny testified at trial that she observed very unusual lesions, an old tear that was healed over with scarring, and a dilated vaginal orifice. The hymenal ring was discontinuous, thick, and some areas lacked normal vasculature. The doctor testified that the conditions were consistent with sexual penetration. The vaginal opening was "dramatically dilated" to a diameter of 12 mm., "extremely large compared to most children her age." Such a finding was consistent with sexual abuse.

Dr. Jenny noted, however, that extensive studies of the normal limits of vaginal openings did not exist. She stated that one study had looked at several hundred children and set 7 mm. as the upper range limit. Based on the thousands of examinations she had personally conducted, consultation with other professionals, and existing literature, J.'s vaginal opening size was "abnormal to a reasonable medical certainty."

Defense counsel cross-examined Dr. Jenny on the medical literature that addresses the significance of vaginal opening size. She discussed flaws in the methodology of an article by Emans and Woods which compared vaginal openings of sexually abused and nonabused children. She discussed the pros and cons of other articles, and stated that the field was a developing one.

Young was convicted of first degree statutory rape and indecent liberties, and a judgment entered against him on February 14, 1989.

## MOTION TO STRIKE

Young moved to strike from the State's appellate brief certain medical journal articles that were not presented to

the trial judge and are not part of the record. The motion is granted and the articles will not be considered in reviewing the court's ruling on admissibility of medical testimony.

## THE CHILD HEARSAY STATUTE

*State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984) sets forth factors for determining the admissibility of child hearsay statements pursuant to RCW 9A.44.120:

"(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness." [*State v.*] *Parris*, [98 Wn.2d 140,] 146[, 654 P.2d 77 (1982)]. . . . [6] the statement contains no express assertion about past fact, [7] cross examination could not show the declarant's lack of knowledge, [8] the possibility of the declarant's faulty recollection is remote, and [9] the circumstances surrounding the statement . . . are such that there is no reason to suppose the declarant misrepresented defendant's involvement.

Appellant challenges five of these indicia of reliability, impliedly conceding that the other criteria are satisfied.

Under the second *Ryan* factor, Young challenges J.'s general character for truthfulness, arguing that her character became questionable when she recanted at trial, although Young admits that J. had no apparent motive to lie. Young does not question J.'s truthfulness as it was known at the time of the hearsay hearing, but only after a subsequent in-court recantation. This argument is unpersuasive, however, because the trial court's assessment of J.'s truthfulness must be judged by the information presented at the hearsay hearing. Such recantations are not rare,[1] and the credibility of the child hearsay (and of the recantation itself) is evaluated by the jury. Thus, J.'s recantation at trial does not undermine the court's assessment of her truthfulness at the earlier hearsay hearing.

---

[1] *State v. Madison*, 53 Wn. App. 754, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989).

■ Young next argues that the fourth *Ryan* factor is not satisfied, because J.'s statements to Dr. Mays, Ms. Schmidt, and Ms. Lewis were not spontaneous, but were in response to questions about sexual abuse. Washington law, however, recognizes that a child's answers are spontaneous so long as the questions are not leading or suggestive. *State v. Henderson*, 48 Wn. App. 543, 550, 740 P.2d 329, *review denied*, 109 Wn.2d 1008 (1987) broadened the definition of "spontaneous" to include "the entire context in which the child [made] the statement." Questions put to J. appear no more suggestive nor leading than those in *Henderson*, and therefore her comments were spontaneous.[2]

■ Young next argues that because J.'s statements were made after the CPS workers became aware of the abuse, the reliability of the statements is suspect because of their timing (*Ryan* factor 5). As long as there are law enforcement officers or social workers investigating child abuse, however, a child's statements will almost always be made after professionals become aware of the abuse. Indeed, rather than diminishing reliability, we believe that in this case the presence of CPS workers enhanced it:

> Professionals are, by definition, trained to be objective in assessing whether a child's complaint merits further investigation, and unlike parents, their perceptions are not impaired by a personal attachment to the child.

*Henderson*, at 551. Furthermore, J.'s first disclosure came to Dr. Mays before CPS workers became aware of possible abuse. We therefore conclude that the timing of the statements was not suspect, especially those made to Dr. Mays before CPS workers became aware of the abuse.

■ Under the sixth *Ryan* factor, Young argues that statements containing assertions about past facts should

---

[2]In *Henderson*, the child "*volunteered* the information that her father stuck his fingers in her vagina when Detective Hinds asked S why it hurt her when her father touched her vagina. His question was neither leading nor suggestive." *Henderson*, at 550. *See also State v. Madison*, at 759 (child's statements when foster mother asked questions while sharing a book on human reproduction were spontaneous).

not have been allowed into evidence. However, the State is correct in noting that *State v. Stange*[3] essentially wrote the past facts test out of *Ryan* so long as other factors indicating reliability are considered. *State v. Swan*[4] acknowledged that hearsay statements usually contain statements of past facts. *Swan* also noted with approval that the sixth *Ryan* factor in *State v. Leavitt*[5] weighed in favor of neither reliability nor unreliability. We therefore find that past facts within J.'s hearsay statements do not by themselves undermine the statements' reliability.

▪ Young's final argument under *Ryan* (factor 8) is that it was impossible to determine whether J.'s recollection was faulty because it was unclear when the incidents occurred. This argument is unpersuasive, however, because it incorrectly equates knowledge of when an incident occurred with reliability of a child's recollection. Irrespective of when the alleged incidents took place, a jury evaluates a child's recollection by observing the manner in which the child witness recounts the events, the child's memory of contemporary events, and the child's demeanor. Furthermore, in this case it is significant that J.'s psychologist noted a normal memory and ability to perceive, both of which are fully corroborated by the record.

▪ Although we believe that each of the *Ryan* factors have been adequately met, no single factor is decisive in determining the reliability of a child's out-of-court statements.[6] Based on an overall evaluation of the *Ryan*

---

[3]53 Wn. App. 638, 769 P.2d 873, *review denied*, 113 Wn.2d 1007 (1989). The court stated that "an assertion as to past fact should be seen as part of the risk of admitting child hearsay statements, rather than as an evaluative factor". *Stange*, at 647.

[4]114 Wn.2d 613, 650-51, 790 P.2d 610 (1990).

[5]111 Wn.2d 66, 75, 758 P.2d 982 (1988).

[6]*State v. Swan, supra* at 652, stated that "[i]t is clear that not every factor listed in *Ryan* needs to be satisfied before a court will find a child's hearsay statements reliable under the child victim hearsay statute, RCW 9A.44.120."

factors, we find no abuse of discretion[7] in the trial court's admission of J.'s testimony.

## VALIDITY OF SEARCH WARRANT AND HARMLESS ERROR

Young argues that because J. had been out of the home and could not have seen the sticks for at least a year before the search warrant was issued, the information supporting the warrant was sufficiently stale to destroy the warrant's probable cause.

The validity of search warrant affidavits must be tested "in a commonsense manner rather than hypertechnically". *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977). What is important is not the actual date on which illegal activity was observed, but rather a "magistrate's conclusion that the property sought is probably on the . . . premises . . . at the time he issues the warrant." *Partin*, at 904.

Here, a period in excess of 1 year obviously casts doubt on the validity of the warrant because there was little basis for believing that the sticks were still present.

> It is not enough . . . to set forth that criminal activity occurred at some prior time. The facts or circumstances must support the reasonable probability that the criminal activity was occurring at or about the time the warrant was issued. *Sgro v. United States*, 287 U.S. 206, 77 L. Ed. 260, 53 S. Ct. 138, 85 A.L.R. 108 (1932).

*State v. Higby*, 26 Wn. App. 457, 460, 613 P.2d 1192 (1980). The *Higby* court concluded that the sale of a small amount of marijuana did not provide probable cause to search 2 weeks later.[8] Staleness thus involves not only duration, but the probability that the property in question would be retained.

The State argues that cases such as *Higby* involving contraband are not on point because contraband would normally be consumed or sold, whereas otherwise neutral

---

[7] "The trial court's finding that a statement is admissible under RCW 9A.44.120 should not be reversed absent a showing of manifest abuse of discretion." *Henderson*, at 549.

[8] *See also State v. Spencer*, 9 Wn. App. 95, 510 P.2d 833 (1973).

instrumentalities of a crime, such as the sticks found in Young's dresser, are more likely to remain on the premises. The State cites some cases from other jurisdictions for this proposition.[9] None of them involve information a year (or more) old, as in the present case.

■ More significantly, when Young was charged in October 1987 he was put on notice of J.'s statement about a stick used to molest her. This fact makes the sticks more like contraband and unlike the neutral items found to justify relaxing the staleness test in the cited cases. This information undermines the basis for believing the sticks would continue to be present. We conclude that the affidavit's information about the sticks in Young's dresser was stale and the sticks should not have been admitted in evidence.

■ The admission of unconstitutionally seized evidence is analyzed under the constitutional harmless error test.[10] The test is whether "the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). The *Guloy* court adopted the

> "overwhelming untainted evidence" test, [in which] the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt.

*Guloy*, at 426. Constitutional error is presumed prejudicial and the State bears the burden of proving that the error was harmless.[11]

---

[9]*State v. Ernest*, 200 Neb. 615, 264 N.W.2d 677 (1978) (photographs as mementos); *United States v. Jacobs*, 715 F.2d 1343 (9th Cir. 1983) (clothing); *State v. Young*, 37 Ohio St. 3d 249, 525 N.E.2d 1363 (1988) (clothing); *State v. Jones*, 299 N.C. 298, 261 S.E.2d 860 (1980) (gloves and a hatchet).

[10]*State v. Whelchel*, 115 Wn.2d 708, 728, 801 P.2d 948 (1990); *State v. Koepke*, 47 Wn. App. 897, 907, 738 P.2d 295 (1987).

[11]*Guloy*, at 425.

In the present case, we find that the sticks were inconsequential to the determination of Young's guilt.[12] Police Officer Berglund testified that J. did not recognize the sticks when they were shown to her. Additionally, Young's wife offered a rational innocent explanation for their presence — that they were used for storing knitting needles, and were kept in the dresser to keep the needles out of the children's way because needles are dangerous. The State's case was based primarily on J.'s hearsay statements made to doctors and a social worker identifying the defendant as the person who sexually abused her. The testimony as to the fact of abuse is confirmed and corroborated by Dr. Jenny's physical findings. In this connection it is significant that Dr. Mays in the course of a routine examination immediately suspected sexual abuse based on her physical observations. J.'s credibility is the controlling issue. We find no reason to believe that the jury's evaluation of her testimony was in any way affected by the improper admission of the sticks. A review of the parties' final arguments at trial supports our view of the relative unimportance of the sticks in light of all the other evidence. Accordingly, we are convinced beyond a reasonable doubt that any rational jury would have reached the same result had the sticks not been admitted into evidence. The erroneous admission of the sticks was harmless error and does not require reversal.

TESTIMONY REGARDING CONDITION OF J.'S GENITALS

Young argues that the trial court erred in allowing testimony concerning the condition of J.'s genitals, and in particular, allowing Dr. Jenny's opinion that the condition was consistent with sexual abuse. Young does not dispute that Dr. Jenny was qualified as an expert or that her testimony would have been helpful to the fact finder.

---

[12] Young's brief refers to sticks as merely "an important and prejudicial piece of *corroborative* evidence". (Italics ours.)

Rather, he claims that her testimony does not meet the so-called *Frye* standard.[13]

■ We agree with *People v. Mendibles,* 199 Cal. App. 3d 1277, 1292-93, 245 Cal. Rptr. 553, 562 (1988) that "there is a distinct difference between the development of a new scientific technique, i.e., 'a novel method of proof' . . . and the development of a body of medical knowledge and expertise." (Citations omitted.) Like the case at hand, *Mendibles* concerned observations by an expert using a colposcope. The court allowed the expert's testimony because the *Frye* standard does not apply to the expression of expert medical opinions concerning the cause of an injury.

While Dr. Jenny's testimony showed a familiarity with the relevant literature consistent with her opinions, her testimony did not involve any new methods of proof or new scientific principles from which conclusions are drawn.[14] Nor did she testify that any single observation proved that sexual abuse had occurred, or that the abuser could be identified, or that any of the findings could only have resulted from abuse. Dr. Jenny merely testified that certain clinical findings existed, and that in her own professional experience those clinical findings were consistent with penetration and abuse. This testimony was in accord with ER 702.[15] Accordingly, we find that the *Frye* standard is inapplicable to Dr. Jenny's testimony.

---

[13]*Frye v. United States,* 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923). The *Frye* standard is whether the scientific principle from which deductions are made is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye,* at 1014.

[14]*See Ivy v. State,* 522 So. 2d 740, 743-44 (Miss. 1988); *Johnson v. State,* 186 Ga. App. 77, 366 S.E.2d 409 (1988); *Onwan v. Commonwealth,* 728 S.W.2d 536, 537 (Ky. Ct. App. 1987).

[15]ER 702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Young also argues that Dr. Jenny's testimony was unfairly prejudicial and went to the ultimate issue in the case. However, the record reflects that she testified about the conditions and their consistency with sexual abuse. Young's reliance on *State v. Black*[16] is misplaced. In *Black*, the court rejected the "rape trauma syndrome" as a reliable way of proving rape because the symptoms have so many other possible causes. Here, the injuries were physical, observable and measurable, and had few possible causes other than sexual abuse. There was no error in the admission of Dr. Jenny's testimony.

### INEFFECTIVENESS OF COUNSEL

Young next claims that the trial court erred by failing to appoint new counsel to argue Young's motion for a new trial based on ineffectiveness of trial counsel. This issue was addressed in another statutory rape and indecent liberties case, *State v. Stark*.[17] In *Stark*, the defendant argued that the trial court should have appointed new counsel to argue ineffectiveness of counsel. The court ruled that whether new counsel should be appointed "rests within the sound discretion of the trial court." *Stark*, at 252.[18]

> [I]f a defendant could force the appointment of substitute counsel simply by expressing a desire to raise a claim of ineffective assistance of counsel, then the defendant could do so whenever he wished, for whatever reason. *See* [*State v.*] *Sinclair*, 46 Wn. App. [433,] 436-37[, 730 P.2d 742 (1986)] (defendant cannot force appointment of substitute counsel simply by filing complaint against current counsel). We decline to adopt such a rule.

*Stark*, at 253.

 We agree with the general rule as formulated in *Stark*, especially when the claim is predicated on the

---

[16]109 Wn.2d 336, 745 P.2d 12 (1987).

[17]48 Wn. App. 245, 738 P.2d 684, *review denied*, 109 Wn.2d 1003 (1987).

[18]Citing *State v. Lytle*, 71 Wn.2d 83, 84, 426 P.2d 502 (1967) and *State v. Shelton*, 71 Wn.2d 838, 840, 431 P.2d 201 (1967).

record. In this case, however, the allegations are based primarily on actions not reflected in the record, such as the failure to call as witnesses Young's former attorney and the attorney's investigator. These witnesses would apparently testify that J. had told them that the appellant had not abused her. Additional affidavits filed by Young were not read or considered by the trial court. The record before us raises sufficient factual issues for us to conclude that it was an abuse of discretion not to appoint new counsel to review the facts and argue the motion for a new trial based on the ineffectiveness of trial counsel.[19]

Accordingly, we reverse and remand for the appointment of new counsel to review the claim of ineffective trial counsel and for the court to conduct such hearings as it deems necessary to enter appropriate findings and conclusions. In all other respects, Young was accorded due process and the decision is affirmed.

WEBSTER, A.C.J., and SCHOLFIELD, J., concur.

After modification, further reconsideration denied September 16, 1991.

---

[19]The court apparently felt that the ineffectiveness of counsel should be handled on appeal. However, where substantial factual issues are raised, especially outside the record, the better practice is for the trial court to appoint new counsel to review and present argument, because the trial court is familiar with the conduct of the trial, memories will be fresh, and witnesses will be available. The trial court should then make appropriate findings and conclusions, thus avoiding a remand and a belated hearing.