2015 JUN -8 AM 9: 21


IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72145-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| J.A.M.M. | ) | |
| DOB: 04/18/2000, | ) | |
| | ) | |
| Appellant. | ) | FILED: June 8, 2015 |

SCHINDLER, J. — J.A.M.M. seeks reversal of his conviction for rape of a child in the first degree. J.A.M.M. contends the court erred in admitting child hearsay statements the victim made to his mother and a child interview specialist. We disagree, and affirm.

## FACTS

In July 2012, five-year-old K.R. went to stay at his paternal grandparents' house in Everett for a week or two while his mother A.H. was out of town. The grandparents' 12-year-old son J.A.M.M. lived with K.R.'s grandparents.

After returning home, A.H. noticed K.R. was acting "more emotional" than normal. At the time, A.H. assumed K.R. was sad because he missed his father.

A few days later while the family was getting ready to go swimming, K.R. told A.H. he needed to tell her something and then burst into tears. A.H. said, "[O]kay, what's going on." K.R. told A.H. that while he was at his grandparents' house, J.A.M.M. "made him suck his pee pee." A.H. asked K.R. how it started and what J.A.M.M. had said to him. K.R. told A.H. that it happened in a bedroom at the grandparents' house and J.A.M.M. told K.R. not to tell anyone. K.R. told his mother that J.A.M.M. "would hold his head there and it made him choke." K.R. asked A.H. never to make him go back to J.A.M.M.'s house again. A.H. called the police.

In August, K.R. met with child interview specialist Gina Coslett at Dawson Place Child Advocacy Center. When Coslett asked K.R. what he was there to talk to her about, he said, "I don't remember." Coslett asked K.R. if he did not remember or if he did not want to talk about it. K.R. told Coslett he did not want to talk about it because it was "a hard question."

Three weeks later, K.R. met with Coslett again. When Coslett asked K.R. what he was there to talk to her about, he said J.A.M.M. "made me suck his peepee." K.R. told Coslett that it happened in J.A.M.M.'s room and that J.A.M.M. closed the door and blocked it with a suitcase. K.R. said it happened "more than one time" and J.A.M.M. threatened to hurt K.R. if he told anyone. Coslett asked K.R. if J.A.M.M. "want[ed] you to touch [any] other part of his body" or if J.A.M.M. "put his peepee on any other part of your body." K.R. said he did not.

The State charged J.A.M.M. in juvenile court with child molestation in the first degree and rape of a child in the first degree.

The parties agreed to combine the competency, child hearsay, and fact-finding hearings. K.R., A.H., child interview specialist Gina Coslett, and Snohomish County Sheriff's Office Detective Steven Martin testified. The court admitted into evidence the transcripts of Coslett's interviews with K.R.

The court entered detailed findings of fact and conclusions of law. The court found K.R. was competent to testify and the hearsay statements he made to A.H. and Coslett met "all nine of the Ryan[1] factors." The court conluded that "[w]ith regard to time, content and circumstances the child hearsay statements made in this case show sufficient indicia of reliability to be admissible."

The court found J.A.M.M. guilty of child molestation in the first degree and rape of a child in the first degree. The court granted the State's motion to dismiss the child molestation count and imposed a standard range disposition of 15 to 36 weeks in the custody of the Juvenile Justice and Rehabilitation Administration.

## ANALYSIS

J.A.M.M. contends the court erred in ruling the hearsay statements K.R. made to his mother and the child interview specialist were admissible under RCW 9A.44.120 and State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984).

We review a court's admission of child hearsay statements for a manifest abuse of discretion. State v. Woods, 154 Wn.2d 613, 623, 114 P.3d 1174 (2005). The court abuses its discretion when it bases its decision on unreasonable or untenable grounds. State v. C.J., 148 Wn.2d 672, 686, 63 P.3d 765 (2003). We review the factual findings supporting the admission for substantial evidence. State v. Halstien, 122 Wn.2d 109, 128, 857 P.2d 270 (1993). Substantial evidence is evidence sufficient to persuade a

---

[1] State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

fair-minded rational person of the truth of the premise asserted. Halstien, 122 Wn.2d at 129. Unchallenged findings are verities on appeal. State v. Shafer, 156 Wn.2d 381, 391, 128 P.3d 87 (2006).

Under RCW 9A.44.120(1), a statement by a child under the age of 10-years-old describing sexual contact is admissible if the "time, content, and circumstances of the statement provide sufficient indicia of reliability." In Ryan, the court identified nine factors to determine reliability: (1) whether there is an apparent motive to lie, (2) the declarant's general character, (3) whether more than one person heard the statements, (4) whether the statements were spontaneous, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contains express assertions about past facts, (7) whether cross-examination could show the declarant's lack of knowledge, (8) whether the possibility that the declarant's recollection is faulty is remote, and (9) whether the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented the defendant's involvement. Ryan, 103 Wn.2d at 175-76; see also State v. Swan, 114 Wn.2d 613, 647-48, 790 P.2d 610 (1990).

We consider the Ryan factors as a whole; no single factor is decisive. State v. Young, 62 Wn. App. 895, 902, 802 P.2d 829, 817 P.2d 412 (1991). To be admissible, the statements need only substantially meet these factors. Woods, 154 Wn.2d at 623-24. Because only the trial court has the opportunity to see and evaluate the child and the other witnesses, it is in the best position to determine the reliability of child hearsay statements. State v. Pham, 75 Wn. App. 626, 631, 879 P.2d 321 (1994). Accordingly,

"[t]he trial court is necessarily vested with considerable discretion in evaluating the indicia of reliability." C.J., 148 Wn.2d at 686.

J.A.M.M. contends K.R.'s hearsay statements were unreliable due to repeated questioning and the use of leading questions. J.A.M.M. argues substantial evidence does not support the court's findings as to two of the Ryan factors, spontaneity and number of people who heard. The court found, in pertinent part:

> **Spontaneous-** The initial disclosure was completely spontaneous. The disclosure to Gina Coslett was to a professional; and questions asked were not generally leading or suggestive. There were direct questions used to follow up on past information which is permissible under [State v. Henderson, 48 Wn. App. 543, 740 P.2d 329 (1987)].
> [ ]
> **Number of People Who Heard-** K.R. told his mother, Gina Coslett, and testified in court sufficiently consistently.

Statements to Mother

J.A.M.M. concedes the initial disclosure K.R. made to A.H. was spontaneous but argues that K.R.'s subsequent hearsay statements to his mother were the result of leading questions. The record does not support his argument.

A child's statements are spontaneous "so long as the questions are not leading or suggestive." Young, 62 Wn. App. at 901. A leading question is one that suggests the desired answer. State v. Scott, 20 Wn.2d 696, 698, 149 P.2d 152 (1944).

When K.R. started crying and told A.H. he had to tell her something, A.H. said to him, "[O]kay, what's going on." A.H. testified she was surprised when K.R. responded that J.A.M.M. "made him suck his pee pee" because it was "out of the blue." A.H. testified that after this unexpected disclosure, she asked K.R. "how did it start, where was his grandma and his brother, [and] what [J.A.M.M.] told him." These questions were not leading because they "were open-ended and did not suggest that the child

respond with a statement about sexual contact." State v. Kennealy, 151 Wn. App. 861, 883, 214 P.3d 200 (2009).

J.A.M.M. relies on Ryan to argue that because A.H. asked K.R. follow-up questions after the initial disclosure, all of his subsequent statements were tainted by his mother's lack of objectivity. In Ryan, the mothers of two child victims had been told "of the strong likelihood that the defendant had committed indecent liberties upon their children" before either child disclosed the abuse to his mother. Ryan, 103 Wn.2d at 168-69, 176. After hearing about the abuse from someone else, each mother questioned her child about what happened. Ryan, 103 Wn.2d at 168-69. The court concluded the children's statements to their mothers were unreliable in part because the mothers were "predisposed to confirm what they had been told." Ryan, 103 Wn.2d at 176. The court stated, "Their relationship to their children is understandably of a character which makes their objectivity questionable." Ryan, 103 Wn.2d at 176.

Unlike in Ryan, the record shows A.H. was not predisposed to ask K.R. suggestive questions in order to confirm an accusation or preconceived suspicion. A.H. testified she "was taken back" when K.R. suddenly started crying and telling her about the incident because she had no prior suspicion of abuse. Without more, the fact that A.H. is K.R.'s mother does not render his statements to her inherently unreliable. Rather, when a witness is in a position of trust with the child, that relationship likely enhances the reliability of the child's statements. Swan, 114 Wn.2d at 650.

J.A.M.M. also argues the court erred in relying on Henderson for purposes of analyzing spontaneity. We disagree. In Henderson, we stated that the fourth Ryan factor "compels a less narrow definition of 'spontaneous,' one that considers the entire

context in which the child makes the statement." Henderson, 48 Wn. App. at 550. The court did not manifestly abuse its discretion in considering the context in which K.R. answered his mother's open-ended nonsuggestive questions.

Statements to Child Interview Specialist

J.A.M.M. contends K.R.'s hearsay statements to Coslett were unreliable because they were the result of improper repeated questioning that had a coercive effect on the child. Again, the record does not support his argument.

The record shows the statements K.R. made to Coslett were not the result of incessant questioning or the use of leading questions:

| CIS[2] Coslett: | . . . . So [K.R.] tell me about what you came to talk to me about today |
| :--- | :--- |
| [K.R.]: | of [J.A.M.M.] |
| CIS Coslett: | of [J.A.M.M.], okay, what about [J.A.M.M.] |
| [K.R.]: | he made me suck his peepee |
| . . . . | |
| CIS Coslett: | okay, when he made you suck his peepee where is his peepee |
| [K.R.]: | points down under the table area towards himself |
| CIS Coslett: | Okay and what does he use that part of his body for, what is that part of the body for |
| [K.R.]: | to go potty |
| . . . . | |
| CIS Coslett: | . . . . [T]ell me everything about how what part of your body you used to suck his peepee that he made you |
| [K.R.]: | my mouth |

---

2 Child interview specialist.

7

CIS Coslett:     your mouth okay what did you taste when that happened

[K.R.]:     it was gross stuff.

J.A.M.M. relies on an out-of-state case, State v. Michaels, 136 N.J. 299, 642 A.2d 1372 (1994), for the proposition that repeated questioning weighs against a finding of spontaneity. Michaels does not support his assertion that multiple instances of questioning, without more, necessarily diminishes the reliability of a child's out-of-court statements.

In Michaels, a nursery school teacher was convicted of sexual abuse against a number of children. Michaels, 136 N.J. at 303. Because there was "limited physical evidence" to prove the abuse, the "bulk of the State's evidence" consisted of statements made by the children during "highly improper" pretrial interviews. Michaels, 136 N.J. at 305-06, 315. The children "were subjected to repeated, almost incessant, interrogation" by investigators who "were not trained in interviewing young children." Michaels, 136 N.J. at 315, 313. The investigators "asked blatantly leading questions that furnished information the children themselves had not mentioned" and utilized "mild threats, cajoling, and bribing" to obtain inculpatory statements. Michaels, 136 N.J. at 314-15. Based on "a highly nuanced inquiry into the totality of circumstances surrounding those interviews," the court held that "a hearing must be held to determine whether those clearly improper interrogations so infected the ability of the children to recall the alleged abusive events that their pretrial statements and in-court testimony based on that recollection are unreliable and should not be admitted into evidence." Michaels, 136 N.J. at 306, 315-16.

8

Here, unlike in <u>Michaels</u>, K.R. was questioned by a "child interview specialist." Coslett received ongoing training in the child interview techniques recommended by the National Institute of Child Health and Human Development. Coslett testified that at the beginning of a child interview, she goes over "ground rules," such as telling the child that "it's okay to say I don't know and it's important not to guess." Coslett testified she does not "go in with a preconceived idea, nor do I want to suggest to the child something that happened."

During the first interview when K.R. was reluctant to talk to Coslett about what happened with J.A.M.M., she asked K.R. whether "you don't remember or you don't want to talk about it." K.R. answered, "I don't want to talk about it" and Coslett said, "[H]ow come [K.R.] you don't want to talk about it." When K.R. responded, "[C]ause it's a hard question," Coslett redirected the conversation to talk about "rules at home about being safe." Unlike in <u>Michaels</u>, Coslett did not incessantly interrogate K.R. with leading questions, nor did she use threats or bribes to obtain an inculpatory statement. In fact, J.A.M.M. concedes that "several of the egregious investigative techniques that occurred in <u>Michaels</u> did not happen here." K.R. simply did not want to talk about the incident during his first meeting with Coslett and the fact that they had a second follow-up meeting does not, without more, nullify the spontaneity of his statements.

In addition, "when more than one person hears a similar story of abuse from a child, the hearsay statement is more reliable." <u>Kennealy</u>, 151 Wn. App. at 883. Here, the record shows K.R. "told a substantially similar account of the events to multiple people sequentially." <u>Kennealy</u>, 151 Wn. App. at 883. K.R. repeatedly stated that J.A.M.M. "made me suck his peepee." K.R. consistently said J.A.M.M. did not try to

touch him or make him do anything else. K.R. also repeatedly stated that J.A.M.M. told him not to tell anyone and that it was hard for him to talk about the incident.

Because the court did not manifestly abuse its discretion in concluding the <u>Ryan</u> factors were substantially met and admitting the hearsay statements K.R. made to his mother and Coslett, we affirm.

WE CONCUR: