**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON, )
                                               )

               Respondent, )

                                               )

        v. )

T.S.T., )

B.D. 08/23/00, )

                     Appellant. )

_____ )

DIVISION ONE

No. 73912-3-I

ORDER GRANTING MOTION TO CHANGE CASE TITLE AND REDACT APPELLANT'S FULL NAME FROM OPINION, WITHDRAWING OPINION, AND SUBSTITUTING OPINION

The appellant, T.S.T., has filed a motion to change case title and redact her full name from the opinion. The respondent, State of Washington, has filed a response, stating that it does not object to the motion. The court has determined that said motion should be granted and that the opinion filed on October 3, 2016 shall be withdrawn and a substitute unpublished opinion be filed. Now, therefore, it is hereby

ORDERED that the motion to change case title and redact appellant's name from the opinion is granted; it is further

ORDERED that the opinion filed on October 3, 2016 is withdrawn and a substitute unpublished opinion shall be filed.

DATED this 14th day of November, 2016.

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | No. 73912-3-I |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| T.S.T., | ) | |
| B.D. 08/23/00, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 14, 2016 |
| | ) | |

DWYER, J. —T.S.T. was charged and convicted of rape of a child in the first degree. The complainant was A.W., T.S.T.'s 8-year-old cousin. Following a pre-trial hearing, the trial court ruled that A.W.'s statements to her mother, a detective, and a child interview specialist would be admissible at trial. On appeal, T.S.T. contends that the trial court erred by so ruling. Finding no error, we affirm.

I

A.W. lived with her mother, Brianna McMillon, in SeaTac between 2012 and 2013. During this time, McMillon began to visit her niece, 12-year-old T.S.T., who was staying at Ryther, a children's mental health facility. After T.S.T. left Ryther and began staying with her father in Seattle, McMillon began inviting T.S.T. to spend time with her and A.W. at McMillon's house. T.S.T. stayed with McMillon the weekend of August 2–4, 2013.

McMillon had a strange feeling about T.S.T. when she arrived for the weekend. McMillon observed that T.S.T. and A.W. were spending a lot of time in A.W.'s room, and that the door was frequently closed despite McMillon's repeated orders to leave it open. McMillon testified that, on that Saturday night, she opened the door to the bedroom to find both T.S.T. and A.W. on the floor. When T.S.T. and A.W. saw the door open they jumped apart from each other.

The following night, after T.S.T. and the other guests had left McMillon's house, McMillon confronted A.W. about T.S.T. McMillon asked A.W. if T.S.T. had touched her private parts. A.W. was unresponsive and asked to go to bed. McMillon pressed A.W. to tell her if T.S.T. had touched her private parts, and refused to let A.W. go to bed until she answered. McMillon asked A.W. if T.S.T. had touched her private parts, put her fingers in her private parts, and kissed her on her mouth, all of which A.W. reluctantly confirmed. McMillon asked where this had occurred, and A.W. stated that it happened in her bedroom. McMillon asked if this happened more than once, and A.W. said that it had. McMillon asked why A.W. had not told her earlier, and A.W. responded that T.S.T. had told her not to tell. McMillon later asked if T.S.T. had licked A.W.'s private area and if A.W. had licked T.S.T.'s private area, and A.W. answered yes to both.

The following morning, McMillon took A.W. to T.S.T.'s father's house and confronted T.S.T. McMillon pinned her arm against T.S.T., wrapped her belt around her other hand, and told T.S.T. that she knew that T.S.T. molested her child. McMillon told T.S.T. to apologize for molesting A.W. and T.S.T. did so. A.W. witnessed the confrontation between her mother and T.S.T.

After confronting T.S.T. directly, McMillon took A.W. to the SeaTac police station. The police separated McMillon and A.W., and Detective Robin Fry sat with A.W. in a conference room. Fry asked A.W. if she knew why she was at the police station, and A.W. answered that she did, but that she could not remember the word. Fry paused to let A.W. come up with the word and, eventually, A.W. stated that she was molested. A.W. told Fry that her cousin touched her private parts. A.W. told Fry that this had happened three or four times. Fry asked A.W. if she thought anyone should get in trouble, and A.W. expressed that she just wanted everybody to be okay.

After leaving the police station, McMillon took A.W. to the hospital, where she was given a sexual assault examination. A.W. told the physician that she had been touched and needed to be checked out. The physician asked A.W. if she knew who touched her. A.W. replied that it was her cousin.

The following day, A.W. was interviewed by Carolyn Webster, a child interview specialist. In response to open-ended questioning, A.W. told Webster that T.S.T. told A.W. to lick her private parts and put her mouth on T.S.T.'s boob. A.W. also told Webster that T.S.T. kissed A.W. and put her tongue in A.W.'s mouth. A.W. told Webster that she wanted to stop doing those things with T.S.T., but T.S.T. suggested putting blankets over the bed so nobody could see them. A.W. told Webster that she asked T.S.T. to lick her private parts. A.W. told Webster that her mom would not let her go to bed until she told her mom what happened; she wanted to go to bed and had no choice but to tell her. A.W. could not recall the specifics of any other time that T.S.T. touched her.

The trial court found T.S.T. guilty of one count of rape of a child in the first degree.[1] She now timely appeals.

II

T.S.T. asserts that the trial court erred by admitting statements A.W. made to her mother, Fry, and Webster. This is so, she contends, because the trial court misapplied the Ryan[2] factors when it considered whether the child hearsay statements were admissible.

A trial court is afforded broad discretion in determining the reliability of a child hearsay statement, as it has the opportunity to observe the child and other witnesses. State v. Swanson, 62 Wn. App. 186, 191 n.1, 813 P.2d 614 (1991). We will not reverse such a ruling absent a showing of manifest abuse of discretion. State v. Pham, 75 Wn. App. 626, 631, 879 P.2d 321 (1994) (citing State v. Justiniano, 48 Wn. App. 572, 579, 740 P.2d 872 (1987)). A trial court abuses its discretion when its ruling is manifestly unreasonable, or is exercised on untenable grounds or for untenable reasons. State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). "Erroneous admission of evidence is not grounds for reversal 'unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.'" State v. Sanford, 128 Wn. App. 280, 285, 115 P.3d 368 (2005) (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

---

[1] "A person is guilty of rape of a child in the first degree when the person has sexual intercourse with another who is less than twelve years old and not married to the perpetrator and the perpetrator is at least twenty-four months older than the victim." RCW 9A.44.073(1). "Sexual intercourse" is defined as including any act of sexual contact between persons involving the sex organs of one person and the mouth of another. RCW 9A.44.010(1)(c).

[2] State v. Ryan, 103 Wn.2d 165, 691 P.2d 197 (1984).

RCW 9A.44.120, the statute governing the admissibility of child hearsay statements, reads, in pertinent part:

A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, [or] describing any attempted act of sexual contact with or on the child by another . . . is admissible in . . . criminal proceedings . . . if:
    (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and
    (2) The child either:
    (a) Testifies at the proceedings; or
    (b) Is unavailable as a witness.

"Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out-of-court statement, and not from subsequent corroboration of the criminal act." State v. Ryan, 103 Wn.2d 165, 174, 691 P.2d 197 (1984).

The Ryan court identified nine factors applicable to determining the reliability of a child's out-of-court declarations: (1) whether there is an apparent motive to lie, (2) the general character of the declarant, (3) whether more than one person heard the statements, (4) whether the statements were made spontaneously, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the statement contains express assertions about past fact, (7) whether cross-examination could show the declarant's lack of knowledge, (8) whether the possibility of the declarant's faulty recollection is remote, and (9) whether the circumstances surrounding the statement are such that there is no reason to suppose the declarant misrepresented defendant's involvement. 103 Wn.2d at 175-76.

We have determined that factors (6) and (7) are unhelpful in analyzing child hearsay statements. In re Dependency of S.S., 61 Wn. App. 488, 498, 814 P.2d 204 (1991). Similarly, we have determined that factor (8) is already embraced in factor (5), and that factor (9) calls for reconsideration of the other factors. State v. Borland, 57 Wn. App. 7, 19-20, 786 P.2d 810 (1990). Thus, no particular Ryan factor determines the reliability of child hearsay, but, rather, the Ryan factors must be considered in light of the totality of the circumstances. State v. Young, 62 Wn. App. 895, 902, 802 P.2d 829, 817 P.2d 412 (1991).

T.S.T. asserts that the trial court misapplied the Ryan factors when it found that (1) A.W. did not have a motive to lie, (2) A.W.'s statements to Fry and Webster were "spontaneous," and (3) A.W.'s statements were corroborated by McMillon's observations during T.S.T.'s visit. We address each factor in turn.

T.S.T. first contends that A.W. had a motive to lie during her initial disclosure to her mother because McMillon told A.W. that she could not go to bed until she admitted that T.S.T. abused her.

The trial court found that McMillon had no motive to get T.S.T. in trouble. McMillon voluntarily went out of her way to spend time with T.S.T., both visiting T.S.T. while she was in detention and inviting T.S.T. to her house for the weekend. With that in mind, the trial court found that McMillon would not try and convince A.W. to lie about the sexual abuse. A.W. only admitted what happened after her mother assured A.W. that she would not get in trouble, which the trial court found to weigh in favor of A.W.'s admission being truthful. Based on the

evidence before it, the trial court properly determined that A.W. had no apparent motive to lie.

T.S.T. next contends that A.W.'s statements to Fry and Webster were not spontaneous. This is so, she asserts, both because A.W.'s statements were made in response to questioning and because A.W.'s disclosures to Fry and Webster cannot be considered independent from the first disclosure to her mother.

For the purpose of analyzing this factor, a declaration is considered to be spontaneous if it is made in response to questions that are not leading or suggestive. Young, 62 Wn. App. at 901. The trial court herein properly found that A.W.'s disclosures to Fry and Webster were spontaneous. Both Fry and Webster asked A.W. open-ended questions that did not assume facts, and A.W.'s responses were consistent and detailed. Because A.W.'s statements were made in response to questions by Fry and Webster that were not leading or suggestive, the statements were properly classified as spontaneous.

Although T.S.T. asserts that it is impossible to consider the declarations made to Fry and Webster independent from the declaration made to McMillon because the disclosures were made less than one day apart, T.S.T. cites to no authority to support this assertion. We have previously held that a child's statements to multiple people over time, when the statements are substantially similar, evidences reliability. State v. Kennealy, 151 Wn. App. 861, 883, 214 P.3d 200 (2009). Moreover, A.W.'s statements to Fry and Webster shortly after her initial disclosure to McMillon were consistent with the trial court's reliability

ruling, as it reduces the chance that A.W.'s recollection was faulty. See State v. Swan, 114 Wn.2d 613, 651, 790 P.2d 610 (1990) ("[B]ecause the child's statements . . . were made soon after the event and were consistent with statements made to her aunt and mother, the possibility that she was speaking from faulty recollection was remote.").

Finally, T.S.T. contends that the trial court erred by considering evidence that tended to corroborate the crime itself rather than the circumstances surrounding A.W.'s statements. This is so, she asserts, because the trial court considered McMillon's observations important, notwithstanding that McMillon's observations corroborated the crime itself rather than the circumstances surrounding the disclosure.

Reliability of child hearsay statements must be determined by considering the circumstances surrounding the statements themselves, not evidence tending to corroborate the crime. Ryan, 103 Wn.2d at 174. Although the trial court herein did state that McMillon's statements corroborated what A.W. told Webster, this is but one of many factors that the court considered before ruling that the disclosures were reliable.

In making the determination that A.W.'s hearsay statements were reliable, the trial court carefully analyzed the circumstances surrounding the statements. The court first found that A.W. had no motive to lie. Although A.W. was, at first, reluctant to tell her mother what happened with T.S.T., the court found that this reluctance was because A.W. did not want to get in trouble. It was only after McMillon assured A.W. that she would not get in trouble that A.W. revealed what

- 8 -

happened. Additionally, the court found that McMillon had no reason to convince A.W. to say these things—McMillon had gone out of her way to visit T.S.T. and would have no reason to get T.S.T. in trouble.

The trial court next found that A.W.'s statements to Fry and Webster were spontaneous, as the statements were made in response to open-ended questioning. The court also found that the statements to Fry and Webster were consistent with each other and with A.W.'s initial disclosure to McMillon. That A.W. made substantially similar statements to multiple people supports the court's ruling that the statements were reliable.

Finally, the trial court noted that A.W.'s statements to Webster about what happened between her and T.S.T. were consistent with what McMillon observed. The consistency between A.W.'s statements and the observations made by McMillon extend beyond the crime itself. For example, the trial court noted that A.W. told Webster that T.S.T. came over on Friday, and that nothing happened between her and T.S.T. on Sunday. The consistency between A.W.'s statements and McMillon's observations, beyond the crime itself, support the trial court's ruling that A.W.'s statements were reliable.

Consideration of the reliability of child hearsay statements requires an overall evaluation of the Ryan factors. The trial court demonstrated that it sufficiently considered these factors before ruling that A.W.'s statements were admissible.

Affirmed.

We concur:

_Dwyer, J._

_Appelwick, J._

_Becker, J._